## O'CONNOR et al. v. RHODES. *
### No. 6414.

United States Court of Appeals for the District of Columbia.

Argued May 14, 1935.

Decided June 29, 1935.

Motion for Reargument, etc., Denied July 25, 1935.

Writ of certiorari granted 56 S. Ct. 170, 80 L. Ed. —.

Frederick R. Conway, Swagar Sherley, Frederick De C. Faust, Charles F. Wilson, George P. Barse, Leslie C. Garnett, U. S. Atty., John W. Fihelly, Asst. U. S. Atty., Harry Le Roy Jones, and Edward First, all of Washington, D. C., for appellants.

Richard L. Merrick, Philip H. Marcum, R. H. McNeill, Chas. A. Douglas, and Hugh H. Obear, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, JJ., Associate Justices.

GRONER, Associate Justice.

Appellee, who was plaintiff below, was a depositor and creditor of the Commercial National Bank of Washington, D. C. In February, 1933, the Comptroller of the Currency found the bank to be insolvent and appointed Baldwin receiver. The bank has ever since been in the hands of the receiver, and a dividend of 50 per cent. has been paid to depositors.

When the receiver took charge, there was on deposit with the bank large sums of money to the credit of the Comptroller of the Currency, the Alien Property Custodian, and the United States Shipping Board M. M. Fleet Corporation. The Comptroller, the Fleet Corporation, and the Alien Property Custodian had each demanded and received from the bank certain of its securities for the safekeeping and return of the deposits. The deposit to the credit of the Comptroller consisted of funds of various insolvent banks then in liquidation. That of the Fleet Corporation "was a special account" out of which the current expenses of the corporation were paid. That of the Custodian, a fund designated "the Retained Administrative Expense Fund," made up of retained percentages of enemy-owned money.

Some time during 1933 or 1934 the receiver paid 100 cents on the dollar of the deposits of the Comptroller, the Fleet Corporation, and the Alien Property Custodian.

In the summer of 1934 Rhodes brought his bill and amended bill in the Supreme Court of the District of Columbia, for himself and others similarly situated, against appellants to require the restoration of the excess (viz., 50 per cent.) of money claimed to have been thus preferentially paid by the receiver of the bank.

The Comptroller, the receiver, and the bank filed a joint motion to dismiss, on the ground that the right to bring the suit belonged primarily to the receiver and, lacking a showing that demand had been made upon the Comptroller or the receiver, and refused by them, the plaintiff had no right to maintain the suit. As a further ground, they charged that the Comptroller had authority to exact the pledge and the bank had authority to make it.

The Fleet Corporation and the Attorney General—on whom the powers and duties of the Alien Property Custodian had been conferred by Executive order—moved to dismiss on the same grounds, and in addition on the ground that the deposits in each instance were public moneys of the United States entitled to priority of payment under Rev. St. § 5153, as amended (12 USCA § 90). The Attorney General moved to dismiss also on the ground that the suit is not maintainable because in effect a suit against the United States. The lower court overruled the motions to dismiss. We granted a special appeal on the statement of urgency, etc. We will discuss the defenses in the order in which we have stated them.

First. Was demand upon the receiver of the bank or the Comptroller necessary to plaintiff's right to bring the suit? We think not.

The amended bill alleges that the sum on deposit to the credit of the Comptroller was withdrawn from the bank and paid to the Comptroller by the receiver, at the Comptroller's direction, and that the money to the credit of the Fleet Corporation and the Alien Property Custodian was withdrawn and paid over by the receiver, likewise at the direction and by authority of the Comptroller. These allegations, together with a number of others of like import—for instance, that the respective claims for payment in full were filed "upon the solicitation and request of" the receiver who, in each case, acted on the direction and authority of the Comptroller—abundantly show that the Comptroller and the receiver were both actively and personally involved in the transactions claimed to be unlawful. This, as we think, is enough to take the case out of the ordinary rule.

Undoubtedly it is the right and duty of the receiver, as appellants claim, to decide when it is necessary to institute proceedings against debtors of the bank, and the receiver in this respect is the instrument of the Comptroller and wholly under his control. Kennedy v. Gibson, 8 Wall. 498, 19 L. Ed. 476. The receiver, in applying the machinery of liquidation, becomes to all intents and purposes the bank—at least he stands in the place of the bank; and while the suspension of the bank does not work a dissolution of the corporation (Bank of Bethel v. Pahquioque Bank, 14 Wall. 383, 20 L. Ed. 840), the receiver, after his appointment, represents the bank, its stockholders and creditors. Case v. Terrell, 11 Wall. 199, 20 L. Ed. 134; Scott v. Armstrong, 146 U. S. 499, 13 S. Ct. 148, 36 L. Ed. 1059. Appellee concedes all of this, and agrees that if the purpose of the suit was to enforce the collection of an ordinary claim or debt belonging and owing to the bank or to enforce liability of its stockholders, the Comptroller's power and the receiver's duty would be exclusive; but insists that where, as here, the bill charges that prior to the appointment of the receiver the bank had contracted with certain persons and corporations unlawfully and in contravention of the banking laws of the United States, and the Comptroller and his receiver adopt and confirm such unlawful contracts, the exception, rather than the rule, is applicable. And appellee says that this is even more the case when the Comptroller himself is charged with being an original party to an alleged unlawful contract. We think this must be true, and further that where the bill alleges, by a statement of appropriate and convincing facts, that demand on the Comptroller would be futile, demand in such case is unnecessary. Here, as we have seen, it is alleged that the Comptroller has caused a sum of money to his official credit to be paid back to himself as Comptroller. To demand that he bring suit for its recovery is the equivalent of a demand that he sue himself. Certainly it will not be claimed that, in the circumstances, he would be a proper person to conduct the suit; and this being true, the right of a creditor to sue in his own name ought not to be questioned. This is even more apparent when it is recognized that here, as is shown by the pleadings, the Comptroller, receiver, and the bank are hostile to the claims asserted by the plaintiff in the suit, and are contending not alone against the creditor's right to sue, but as well against the validity of his claims. To say that in every

case the rule of exclusive power in the receiver is positive and admits of no exception, would be to sacrifice substantial rights to matters of form. That is not a purpose for which courts are constituted. See Brinckerhoff v. Bostwick, 88 N. Y. 52–59.

In this view, we think it may be affirmed that while, as a rule, a stockholder's or creditor's suit cannot be maintained until demand has been made upon the receiver, the Comptroller, or the bank, the rule does not apply where the receiver or Comptroller refuses to bring the suit (Ex parte Chetwood, 165 U. S. 443, 17 S. Ct. 385, 41 L. Ed. 782), or where it would be a vain thing to make demand upon them, and it is shown there is necessity for a suit for the protection of the interests of creditors. Thompson on Corporations (3d Ed.) §§ 4594–4596.

Second. Did the bank have authority and capacity to pledge its assets to secure the deposits of the Comptroller, the Fleet Corporation, and the Alien Property Custodian? The question is new.

The right of a national bank to pledge assets to secure a private deposit was decided adversely to the right by the Supreme Court at its present term in the case of Texas & Pac. R. Co. v. Pottorff, 291 U. S. 245, 54 S. Ct. 416, 417, 78 L. Ed. 777. In that case the bank had pledged Liberty bonds to secure the deposit. The receiver of the bank refused to recognize the pledge and the railway insisted that the power to pledge was incidental to the general grant of powers necessary to carry on the business of banking, etc. The Supreme Court said: "National banks lack power to pledge their assets to secure a private deposit. The measure of their powers is the statutory grant; and powers not conferred by Congress are denied. For the act under which national banks are organized constitutes a complete system for their government."

And in Marion v. Sneeden, 291 U. S. 262, 54 S. Ct. 421, 422, 78 L. Ed. 787, decided at the same time, the court said: "For the reasons stated in Texas & Pacific Ry. Co. v. Pottorff, 291 U. S. 245, 54 S. Ct. 416, 78 L. Ed. 777, decided this day, we are of opinion that the Act of 1864 did not confer the power to pledge assets to secure any public deposits except those made under section 45 by the Secretary of the Treasury of the United States. The power conferred by each later act, except that of 1930, was limited to securing specific federal funds. A national bank could not legally pledge assets to secure funds of a state, or of a political subdivision thereof, prior to the 1930 amendment; and since then it can do so legally only if it is located in a state in which state banks are so authorized. In some states national banks had, prior to the 1930 amendment, frequently pledged assets to secure public deposits of the state or of a political subdivision thereof; comptrollers of the currency knew that this was being done; and they assumed that the banks had the power so to do. But the assumption was erroneous. The contention that such power is generally necessary in the business of deposit banking has not been sustained."

We take the Pottorff and Sneeden Cases to hold that under the national banking laws a national bank has no power to pledge its assets to secure a deposit, private or public, unless it is authorized or required to do so by an appropriate act of Congress. If we are correct in giving the decisions this interpretation, it follows that we must have recourse to the statutes to answer the question.

■ Rev. St. § 5153 (Act of June 3, 1864, c. 106, § 45; 13 Stat. 99, as amended, 12 USCA § 90) provides: "All national banking associations, designated for that purpose by the Secretary of the Treasury, shall be depositaries of public money, under such regulations as may be prescribed by the Secretary. * * * The Secretary of the Treasury shall require the associations thus designated to give satisfactory security, by the deposit of United States bonds and otherwise, for the safekeeping and prompt payment of public money deposited with them. * * *"

In Branch v. United States, 12 Ct. Cl. 281, affirmed 100 U. S. 673, 25 L. Ed. 759, it is said that the act of the Secretary in designating a national bank as a depositary of public money does not change its character or organization; that it still retains its identity as a national bank, and does not become the *custodian* of public money, but the *debtor* of the United States, precisely as in the case of other depositors. If security be not taken as the statute permits, the claim of the United States is on a parity with the claims of private creditors. Cook County Bank v. United States, 107 U. S. 445, 2 S. Ct. 561, 27 L. Ed. 537. And in the case of Coudert v. United

States, 175 U. S. 178, 20 S. Ct. 56, 44 L. Ed. 122, it was said that this section (5153) has relation only to public money of the United States. In that case money derived from the sale of a vessel captured during the war between the states as a blockade runner, and deposited by the marshal to await the order of the court as to its disposition, was held not public money of the United States. Public moneys were defined to be the revenues of the United States from all sources covered into the Treasury.

And in Marion v. Sneeden, supra, the Supreme Court specifically held that Rev. St. § 5153 did not confer or imply the power to pledge assets to secure public deposits, except those made under the provisions of that section by the Secretary of the Treasury of the United States.

■ Turning, then, to the bill of complaint, we find it alleged, in the case of the Comptroller, that he had on deposit in the bank a sum of money belonging to a number of insolvent banks. In the case of the Fleet Corporation, that it had on deposit a sum of money for its own use as a petty cash account; and in the case of the Alien Property Custodian, that he had on deposit money deducted from the accounts of enemy aliens and designated administrative expense fund. Taking these allegations as true, we think it is clear that nothing in Rev. St. § 5153 can be said to authorize the taking of a pledge by the several depositors, acting independently of the Secretary of the Treasury, for the safe return of the deposits. There is nothing to show that the deposits were made by direction of the Secretary, or that the fund was subject to his check or control—but everything to the contrary.

There is nothing to show that the depositary bank was designated by the Secretary of the Treasury, under regulations prescribed by himself, to receive the deposits or that he exacted the pledges which are the subject matter of the suit. On the other hand, the statement is that the pledges were in each case taken (a) by the Comptroller, (b) by the Fleet Corporation, and (c) by the Alien Property Custodian.

In this aspect we think the point is broader than the question whether the money is public money, and embraces also the further question whether the pledges (except in the case of the Comptroller, which we think is controlled by another act) were taken in accordance with the provisions of Rev. St. § 5153. For, as we have seen, when national banks are made depositaries of public money, it is the duty of the *Secretary of the Treasury* to require them to give satisfactory security by deposit of bonds, etc., and when this is not done the Government occupies no higher status than a private depositor. Cook County Bank Case, supra. The duty imposed on the Secretary, as we think, is personal and results from the statute we have been discussing, and that Congress meant its language and provisions to be taken literally follows, we think, from the fact that by later acts, to which we shall now refer, Congress, to cover the cases of deposits of federal funds made by others than the Secretary of the Treasury, has specifically provided for such cases by appropriate statutes.

Thus, by Act of July 1, 1898 (Bankruptcy Act, § 50 [11 USCA § 78]), Congress directed the courts to require bonds to be executed to the United States by all banking institutions in which bankruptcy funds are deposited; and by Act of March 3, 1911 (36 Stat. 1070, § 17 [25 USCA § 156]), directed that the Secretary of the Interior take from all banks in which any Indian moneys are deposited collateral security, etc. · And by Act of May 15, 1916 (39 Stat. 121 [12 USCA § 192]), declared that the Comptroller of the Currency shall take security for the funds of insolvent national banks deposited by him; and by Act of May 18, 1916 (39 Stat. 159, § 2 [39 USCA § 759]), required the board of trustees of postal savings funds to deposit in banks and to take security for their safekeeping. And by Act of September 24, 1917 (40 Stat. 291, § 8, as amended [31 USCA § 771]), authorized the Secretary of the Treasury to require security for deposits made of the proceeds from the sale of public bonds. See note 11 to Pottorff Case.

■ These several acts designed to enlarge and extend the right of banks to pledge assets, followed by the Act of June 25, 1930 (46 Stat. 809 [12 USCA § 90]), authorizing security for the payment by national banks of public moneys of states and counties, indicate that Congress recognized that only through the enactment of such statutes would the pledge to secure the particular deposits be valid and enforceable. The purpose of the acts, as we have said, was to enlarge the powers of national banks in relation to the subject-mat-

ter covered by the acts, and the authority in the acts to the depositors to demand the pledge carried with it, as was said by Mr. Justice Brandeis in the Pottorff Case, like authority on the part of the banks to make the pledge. Maryland Casualty Co. v. Board of Commissioners, 128 Okl. 58, 260 P. 1112. And so we reach the further conclusion that wherever Congress by express authority directs the custodian of federal funds, without regard to whether they be technically public or private funds, to deposit them in a national bank and to exact security from the bank for their repayment, the duty thus imposed on the custodian authorizes the bank to give the security or make the pledge. And this brings us to consider the case of the Comptroller which, as we have said, stands on a different basis than the cases of the Fleet Corporation and the Custodian.

▓▓▓ The Act of May 15, 1916, included in the list above, provides that the Comptroller may deposit any of the money of insolvent banks acquired by him in the liquidation of these banks in any state or national bank, and may require of the depositary a pledge of government bonds or other securities for the safekeeping and prompt return of the money deposited. This authority is as broad as that given the Secretary of the Treasury by Rev. St. § 5153, and that authority, as we have seen, the Supreme Court said in the Pottorff Case authorized a national bank to make the pledge. It is difficult, therefore, to see on what ground a distinction can be made in the authority or duty of the bank in the two instances. Certainly, we think, it may not be made on the ground that in the one case the deposit is public money, and in the other, private money; for even though the deposit by the Comptroller be described as private money, it is a federal fund to which the government occupies at least the relation of trustee. A somewhat similar question arose in Richmond, F. & P. R. Co. v. McCarl, 61 App. D. C. 290, 62 F.(2d) 203, 206, certiorari denied, 288 U. S. 615, 53 S. Ct. 506, 77 L. Ed. 988. In that case we had under consideration the question whether excess income under section 15a of the Interstate Commerce Act, as amended by the Act of February 28, 1920, 41 Stat. 488, § 422 (49 USCA § 15a), was public money, and we said: "Here, as we have undertaken to show, the excess earnings of a carrier are money which the carrier has

collected, not in its own right, but as trustee for the United States. While it holds the money, it holds it as trustee for the United States. When it is paid over, it is held by the United States as trustees under the provisions of the act of Congress through which it is created, and it is subject to the trusts which Congress has attached to it. It is not, therefore, public moneys in the sense in which the ordinary revenues of the government are public moneys, but it is nevertheless public moneys in the sense that it is a fund which the United States control and which, through an instrumentality of the United States created by Congress, they disburse. It is therefore clearly moneys which the United States are charged with the duty of conserving." °

We have, therefore, no hesitation in holding that under the act of 1916 the deposit by the Comptroller was valid, and the exaction of the pledge within the terms of the statute and equally valid and binding on the bank. But what we have said as to the deposit of the Comptroller is not controlling in the cases of the deposits by the Fleet Corporation and the Alien Property Custodian, for no statute has been referred to, and we know of none, authorizing national banks to secure deposits of money by public officers generally. Certainly Congress has not specifically provided with relation to funds of the Alien Property Custodian or the Fleet Corporation. In this aspect, the funds of these two depositors are in all respects similar to a private deposit unless the fact that they are public moneys, as to which we express no opinion, changes the rule, and we think it does not; for in the Cook County Bank Case it was held that the claim of the United States for postal funds (which of course were public moneys) deposited by the postmaster at Chicago was entitled to no priority of payment from the assets of an insolvent national bank over private deposits of private depositors. And so we are obliged to hold that on the present state of the record the pledge of securities to the Custodian and Fleet Corporation is invalid.

This leaves for decision only the question whether the suit against the Attorney General, in his capacity as Alien Property Custodian, is in effect a suit against the United States.

▓▓▓ The occasion for naming the Attorney General as one of the defendants

arose out of the fact that by an Executive order he became the successor in interest to the Alien Property Custodian. The bill alleges that the Custodian obtained from the receiver of the bank a sum of money in excess of that to which he was legally entitled, and the bill further alleges that the Attorney General has received and controls the money so illegally obtained by his predecessor. As we have already pointed out, the fund deposited in the bank by the Alien Property Custodian consisted of money made up by the deduction of 2 per cent. of the value of property and money of alien enemies under the general provisions of the Trading with the Enemy Act (50 USCA Appendix § 1 et seq.). We have had occasion to notice the conditions under which the fund was accumulated by the Custodian, and we have always assumed that the fund was a guaranty fund to cover the expense of administration and that the balance after the payment of expenses, if any, would be returned to the several trusts and distributed to the owners. It is a fund exclusively under the control of the Acting Custodian. It is not money of the United States paid into the Treasury of the United States. It is not a part of the revenues of the United States and, in the form in which it is, is not subject to the control of the Secretary of the Treasury. On the other hand, the excess which the bill charges the Alien Property Custodian received over and above other general creditors of the bank was a part of the trust assets of the insolvent bank. It was, therefore, money of the bank out of which all creditors were entitled to be paid ratably. If it was improvidently paid to the Custodian, it is recoverable, and the officer whose act is responsible for the illegal payment is the responsible defendant, and the resort to equity for protection is not to be defeated upon the ground that the suit is one against the United States. Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570. The fund is earmarked for a special purpose in the hands of the Attorney General, as the acting Alien Property Custodian, and no interests of the United States would be affected by a decree in the suit. The fact that Congress has authorized the fund to be used for purposes of the Alien Property Custodian's office does not change its character or the rights of the parties. We, therefore, hold that this is not a suit against the United States. See Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S.

Ct. 340, 56 L. Ed. 570; Miguel v. McCarl, 291 U. S. 442, 54 S. Ct. 465, 78 L. Ed. 901; Ex parte Young, 209 U. S. 123, page 159, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; and see particularly U. S. v. Lee, 106 U. S. 196, 1 S. Ct. 240, 27 L. Ed. 171.

It is claimed by all appellants that the bill is not maintainable because multifarious. We think this point overlooks Federal Equity Rule 26 (28 USCA following section 723), since clearly the bill shows on its face sufficient grounds for uniting the causes of action against the several defendants in order to promote the convenient administration of justice. And we see nothing in the joinder of the parties defendant prejudicial to any of them. See Slater v. Ruggles, 49 App. D. C. 277, 263 F. 1021. All have an interest in the suit, and the court may rearrange the parties as may be proper to the end that complete justice may be done.

From what we have said it is apparent that in overruling the motion of the Comptroller to dismiss the amended bill, insofar as it charged that the payment by the receiver to the Comptroller was illegal, the court erred and should be reversed, and the bill should be dismissed as to the Comptroller. The bill should also be dismissed as to Urey Woodson, former Alien Property Custodian, since no relief is asked against him. The action of the lower court in overruling the motions to dismiss as to the Fleet Corporation and the Attorney General, as acting Alien Property Custodian, and against the receiver and the bank, is affirmed, and the cause is remanded to the court below for further proceedings in conformity with this opinion.

Affirmed in part; reversed in part and remanded.

On Motions for Reargument and Stay of Mandate, and for Reargument or Modification of Opinion and Judgment.

PER CURIAM.

The motion of Homer S. Cummings, Esq., as Attorney General, for reargument is denied, and the motion for stay of mandate is granted.

The mandate will be stayed for 30 days pending application to the Supreme Court for certiorari.

The motion of the Comptroller of the Currency for reargument is denied, and

the motion for modification of the opinion and judgment is denied.

The motion of the Comptroller is confined to the point that the opinion of this court was wrong in holding that plaintiff was entitled to bring the suit. In view of the earnestness with which the point is pressed, we have given the motion further study and consideration. As a result, we think we should adhere to our former decision.

We think it proper, however, to notice a statement contained in the printed argument of counsel for the Comptroller. The statement is that the receiver has since our decision instituted a suit against the acting Alien Property Custodian and the Fleet Corporation (codefendants with the Comptroller in the instant suit), and that the object of the suit is the recovery of assets alleged to have been illegally pledged or the recovery of preferential payments alleged to have been made in consequence of such pledges—covering the same items, in the same circumstances, as are covered in the bill in the instant proceeding.

In the opinion heretofore filed in this case we were careful to point out that in a suit to enforce the collection of a claim or debt belonging and owing to the bank, or to enforce liability of its stockholders, the Comptroller's power and the receiver's duty are ordinarily exclusive, but we also pointed out that where the suit is not brought by the receiver it may be brought by a creditor after demand has been made on the receiver and refused, and likewise where the facts and circumstances make it clear that such a demand would be refused; and we pointed out the facts and circumstances existing in this case which make applicable the exception to the rule.

The record on which the case was submitted showed that the preferential payments alleged to have been made by the receiver of the bank were made at the instance and with the approval of the Comptroller and receiver. That the claims for payment were instigated and invited by the Comptroller and the receiver and, in addition to this, that the Comptroller himself had obtained preferential payments which it was the duty of the receiver to recover for the general creditors of the bank. These facts and circumstances bring the case clearly within the exception to the rule. It is quite true we decided the last-mentioned claim favorably to the Comptroller and dismissed the bill as to him, but our decision in that respect did not defeat the right of plaintiff to continue the suit against the remaining defendants. Jurisdiction having once properly attached, nothing thereafter happening will ordinarily defeat it. But on the statement of counsel for the Comptroller, made on this motion, that he no longer adhered to his former position that the payments to the Fleet Corporation and the Alien Property Custodian were validly made, but, on the contrary, that he had now brought suit to recover the amounts improvidently paid, and in view of the fact that the instant case had got no further than a settlement of the pleadings—though that involved, so far at least as this court is concerned, a determination of the main questions of law—we submitted to counsel the query whether this court had power, in deference to the usual and orderly administration of the affairs of insolvent national banks, to direct the trial court to stay further proceedings in the instant suit pending prosecution by the receiver of the suit filed by the receiver upon the same items embraced in this suit. Counsel for the Comptroller advises us that in his opinion we have no such power, and counsel for appellee appear to entertain the same view.

Without conceding the correctness of the conclusion, we are not disposed now to press the point in view of the fact that no motion is made by either appellants or appellee to that effect. But we say this without prejudice to the right of the trial court, on motion and in the exercise of its judicial discretion, and on such reasonable terms as it may impose, to arrange the order of trial in the two suits as may result in the most economical and speedy determination of the issues involved.

Rehearing denied. Mandate stayed for 30 days.