## HASKINS BROS. & CO. v. MORGENTHAU, Secretary of the Treasury, et al.*

### No. 6710.

United States Court of Appeals for the District of Columbia.

Argued May 29, 1936.

Decided June 30, 1936.

678

William Stanley and J. E. Burroughs, Jr., both of Washington, D. C., for appellant.

Robert H. Jackson, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, Associate Justice.

Appellant, an Iowa corporation, is engaged in the manufacture of soap. Its business is intrastate. In the manufacture of its product it uses large quantities of Philippine coconut oil, and this use constitutes a "first domestic processing" under the terms of section 602½ of the Revenue Act of 1934.[1] The act imposes a tax of 3 cents per pound on the first domestic processing of certain vegetable oils, including coconut oil, and an additional tax of 2 cents per pound on the first domestic processing of coconut oil *not* produced in the Philippines. Appellant brought its bill in the District Court in behalf of itself and others similarly situated against appellees, the Secretary of the Treasury, the Treasurer, and the Comptroller General of the United States. The trial court on motion dismissed the bill. This appeal followed.

The bill alleges that between May 10, 1934, and December 31, 1935, there were imposed on appellant taxes in the amount of $160,879.74, and that this sum was paid under the coercion of threats of penalties, interest, and liens. The bill further alleges that during the same period the United States have collected from other manufacturers similarly situated the sum of over $26,000,000 "which said fund is now held in the Treasury of the United States as a separate fund and is ear-marked as such for the benefit of, and to be paid over to, the Philippine Islands, under and by virtue of said section of said Act."

Section 602½ provides:

"(a) There is hereby imposed upon the first domestic processing of coconut oil * * * a tax of 3 cents per pound, to be paid by the processor. There is hereby imposed (in addition to the tax imposed by the preceding sentence) a tax of 2 cents per pound, to be paid by the processor, upon the first domestic processing of coconut oil * * * except that the tax imposed by this sentence shall not apply when it is established * * * that such coconut oil * * * is wholly the production of the Philippine Islands * * *. All taxes collected under this section with respect to coconut oil wholly of Philippine production or produced from materials wholly of Philippine growth or production, shall be held as a separate fund and paid to the Treasury of the Philippine Islands, but if at any time the Philippine Government provides by any law for any subsidy to be paid to the producers of copra, coconut oil, or allied products, no further payments to the Philippine Treasury shall be made under this subsection. * * *

"(g) All collections except as provided in subsection (a) under this section shall, notwithstanding any other provisions of law, be covered into the general fund of the Treasury of the United States."

The bill alleges that the sale of soap is highly competitive and that coconut oil is necessary in the manufacture; and that during the period May 10, 1934, to December 31, 1935, appellant was unable to recover—i. e., to pass on to the consumer—any of the tax payments imposed by the act by increasing prices or reducing operating and other expenses. It thereby sustained serious losses. The bill charges that the $26,000,000 fund has been deposited in the Treasury of the United States "as a trust fund" and is "held by the defendant, William A. Julian, in his official capacity, and as such, also as trustee of said fund"; that by Act of January 17, 1933, Congress provided for the grant of independence to the Philippine Islands; that the act provides for a new political entity to be created by the adoption of a constitution and the election of officers of the government of the commonwealth of the Philippines and for termination, by proclamation of the President, of the Philippine government as theretofore existing under authority of the United States. That a Constitution for the Philippine Islands has been duly adopted and an election of officers held and the results proclaimed by the President, and that the government theretofore existing under authority of the United States has been terminated (15th day of November, 1935), and the commonwealth of the Phil-

[1] 48 Stat. 680, 763 (26 U.S.C.A. § 999).

ippine Islands has entered upon and is now in full enjoyment of its rights, privileges, powers, etc. And that there is a claim pending against the United States on behalf of the Philippine government in excess of the sum of $26,000,000, representing the collections by the Bureau of Internal Revenue of the processing tax on coconut oil, and that demand has been made upon the United States for payment of the fund on hand, including the amount paid by the appellant; and that appellees claim to have power and authority to certify and allow the claim and there is ground to believe they will pay it unless restrained by an order of court.

That coconut oil is not produced in the United States, but competes with oils and fats which are produced domestically by the farmers and dairy interests of the United States; and that section 602½ (a) of the Revenue Act of 1934 (26 U.S.C.A. § 999 (a) is unconstitutional and void in levying the tax of 3 cents a pound upon Philippine coconut oil, for the reasons:

First, that the imposition does not come within the taxing power of Congress under article 1, section 8, clause 1, of the Constitution of the United States, in that it was not imposed to pay the debts or provide for the common defense or general welfare of the United States but was imposed for the benefit of the Philippine Islands which are not a part of the United States;

Second, the imposition violates the due process clause of the Fifth Amendment because levied on one group for the benefit of another;

Third, that the imposition was imposed as a means to the end of regulating production in the several states, a power not granted to the federal government;

Fourth, that the imposition cannot be justified under the commerce power because processing of coconut oil is intrastate commerce;

Fifth, that the imposition is arbitrary and unreasonable in that it seeks to regulate the intrastate manufacturing business of the taxpayer; and is in fact an attempt by Congress to regulate and control the business of the taxpayer and to force the taxpayer and other users of such coconut oil to discontinue in whole or in part the use of such oil and to use as substitutes therefor oils and fats produced domestically by the farmers and dairy interests of the United States and to further the general

scheme of control of agricultural production contained in the Agricultural Adjustment Act of 1933, and in that respect is in contravention of the Tenth Amendment of the Constitution of the United States;

Sixth, that the imposition violates article 1, section 9, clause 7, of the Constitution because it assumes to dispose of the proceeds without appropriation or without compliance with the Act of August 26, 1842, c. 207, 5 Stat. 536, § 2, and the Act of June 30, 1906, c. 3914, 34 Stat. 764, § 9 (31 U.S.C.A. § 627).

Appellant has filed a claim with the Commissioner of Internal Revenue for refund, and says that the commissioner has denied the claim, and that the total amount of the tax collection will probably be paid over to the Philippine government, resulting in irreparable injury and loss to appellant and others similarly situated. Appellant further says that the $26,000,000 fund is not the property of the United States and that appellees hold it as a trust fund for appellant and others similarly situated whose unlawful tax payments created it and who should now be permitted to recover it in proportion to their several contributions.

The bill prays that the court declare section 602½ unconstitutional and grant an injunction forbidding payment to the government of the Philippines and that the $26,000,000 be declared a trust fund and be ordered by the court to be paid to appellant and others similarly situated.

The case for the appellant has been argued with great skill and ability, and we have given it careful consideration. But we think the conclusion is inescapable that the decree of the lower court dismissing the bill must be affirmed on either of two grounds.

First. We think the suit is in effect one against the United States. It is brought against the Secretary of the Treasury, the Treasurer, and the Comptroller General in their official capacities. It seeks to compel the payment of money now deposited in the United States Treasury. In this view the United States are necessary parties and, since they have not consented to be sued, the suit against the officers of the United States cannot be maintained. We know of no power in this or any other court to compel the Secretary of the Treasury or the Treasurer of the United States, in a suit brought against them in their of-

ficial capacities, to pay out money in the treasury in a manner contrary to that directed by Congress. We hold these general principles to be axiomatic:

■ First, that an act of Congress is necessary for the withdrawal of money from the public treasury;

■ Second, that no suit can be brought to enforce the making of an appropriation;

■ Third, that the Secretary of the Treasury and the Treasurer are officers of the United States holding offices established by law; that their duties are to receive and preserve the public money and not to disburse it except conformably to law; that as officers of the United States they have no right or estate in the public money or any other money in the treasury, whether earmarked as a special fund or as part of the general fund of the United States; that they are in effect mandataries of a limited and defined commission;

■ Fourth, that where an obligation is cast upon a principal and not upon his agent, a court cannot enforce it against the agent as long as he is acting wholly as agent.

■ In the instant case it is therefore of no consequence whether the act under which the tax was collected be constitutional or unconstitutional. The fact that the tax has been collected and deposited in the treasury by the collecting officials of the government renders the custodian of the fund impotent to withdraw the money and disburse it unless and until directed to do so by an act of Congress or until the United States shall submit to be sued to determine its disposition.

■ It is equally of no consequence that the bill alleges that the fund belongs to appellant and others similarly situated. It is not in the hands of the officers but in the treasury, and though earmarked as a special or trust fund, has been mingled with the moneys of the United States. The purpose of the bill, therefore, is to coerce the United States, through their officers, to pay out money in the treasury as to which Congress has limited the power of withdrawal to the payment to the Philippine government. To permit this, would be to usurp the legislative function of appropriation, to substitute a court for the executive officers of the government, and to supplant by an order of court the duty and obligations imposed upon them by their oaths of office. It is therefore of no moment whether the United States have the use of this money as they do the ordinary revenues of the government or whether the money represents a trust fund created by Congress and earmarked for a specific purpose. In either case it is money in the Treasury of the United States as to which the United States had and have the power of control and disposition.

It is incorrect, therefore, to say that the authority and duty of the United States depend alone upon their pecuniary interest. This we held in Richmond, F. & P. R. Co. v. McCarl, 61 App.D.C. 290, 62 F.(2d) 203, 206, certiorari denied 288 U.S. 615, 53 S. Ct. 506, 77 L.Ed. 988. There we had under consideration an act of Congress providing that earnings of railroads in excess of a stated percentage should be paid over to the Interstate Commerce Commission in order to establish a fund which might be used to help weaker lines. The railroad had a claim against the United States and brought suit to enjoin the Comptroller General from withholding the amount claimed. The defense was an offset arising out of the failure of the railroad to pay over this excess to the Interstate Commerce Commission. The railroad contended that the offset was improper because the excess fund was not money of the United States and the United States had no interest in it which would sustain the defense set up to defeat the railroad's claim for services rendered. We recognized that the fund was not—and was not intended to be—a part of the public moneys of the United States, but was instead money which came into the possession of the United States charged with a trust in accordance with the purposes of the act; and we said: "When it is paid over, it is held by the United States as trustees under the provisions of the act of Congress through which it is created, and it is subject to the trusts which Congress has attached to it. It is not, therefore, public moneys in the sense in which the ordinary revenues of the government are public moneys, but it is nevertheless public moneys in the sense that it is a fund which the United States control and which, through an instrumentality of the United States created by Congress, they disburse. It is therefore clearly moneys which the United States are charged with the duty of conserving."

In the later case of O'Connor v. Rhodes, 65 App.D.C. 50, 79 F.(2d) 146,

151, we held that funds in the hands of the Comptroller of the Currency belonging to insolvent national banks, and redeposited by him in other banks for safekeeping, were federal funds to which the government of the United States occupied the relation of trustee. And in a number of cases under the Trading with the Enemy Act (50 U.S.C.A.Appendix, § 1, et seq.) we have held that the fund there accumulated by the custodian, though by law the United States had disclaimed any proprietary right to it and had designated it a trust fund, was nevertheless money as to which the United States, in view of their possession, owed the duty of conservation.

■ The effect of these cases is to prove beyond the shadow of a doubt that the fund realized in the collection of the processing tax on coconut oil imported from the Philippines became, when collected and deposited in the treasury, public moneys of the United States subject to withdrawal only by an act of Congress and, though designated by the Congress as a special fund for the benefit of the Philippine Treasury, it is while in the treasury money as to which the *United States,* and *not appellees,* are trustees. And in this view, the conclusion is inevitable that the United States are essential parties in any litigation involving the fund and, they not having consented to be sued, the suit cannot be maintained.

Precisely this was held in the case of Louisiana ex rel. Elliott v. Jumel, 107 U.S. 711, 722, 2 S.Ct. 128, 137, 27 L.Ed. 448. That case involved a contract entered into by the state of Louisiana with the purchasers of its bonds. The state obligated itself to impose an annual tax on all real and personal property solely for the payment of the bonds and coupons. The act providing for the levy of the tax made it a felony for any fiscal agent or officer of the state to divert the fund derived from the tax to any other purpose than the payment of the bond interest and sinking fund. The tax was collected, and about $300,000 was in the Treasury of the State set aside for the purpose of paying the coupons next falling due. The state at that juncture passed an additional act, prohibiting the payment out of the fund of interest on the outstanding bonds; and suit was brought against the Treasurer and Board of Liquidation of the State to require them to use the trust fund in the payment of the overdue interest. In that case, as in this, the

officer of the state was proceeded against in his official capacity. In that case, as in this, the fund was in the treasury, and it was sought to enforce the prayers of the bill there, as here, upon the principle that the law made the officers trustees of the fund and that, as such trustees, they could be enjoined in that case from diverting it from the purposes to which it was pledged under the contract—and in this, from the persons who legally are entitled to recover it. The Supreme Court said: "The treasurer of state is the keeper of the treasury, and in that way is the keeper of the money collected from this tax, just as he is the keeper of other public moneys. The taxes were collected by the tax-collectors and paid over to him, that is to say, into the State treasury, just as other taxes were when collected. He is no more a trustee of these moneys than he is of all other public moneys. He holds them, but only as the agent of the State. If there is any trust, the State is the trustee, and unless the State can be sued the trustee cannot be enjoined. The officers owe duty to the State alone, and have no contract relations with the bondholders. They can only act as the State directs them to act, and hold as the State allows them to hold. It was never agreed that their relations with the bondholders should be any other than as officers of the State, or that they should have any control over this fund except to keep it like other funds in the treasury and pay it out according to law. They can be moved through the State, but not the State through them."

■ And more or less to the same point, see United States ex rel. Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191; International Postal Supply Co. v. Bruce, 194 U.S. 601, 24 S.Ct. 820, 48 L.Ed. 1134; Belknap v. Schild, 161 U.S. 10, 16 S.Ct. 443, 40 L.Ed. 599,—all of which sustain the conclusion that a suit in equity cannot be maintained against officers of the state to restrain or control the use of money in the public treasury when the suit is commenced, or to compel the state to perform its obligations, or indeed in any case where the state has such an interest in the object of the suit as to be a necessary party. The English cases are to the same effect. See Vavasseur v. Krupp, L.R. 9 Ch. Div. 351; Twycross v. Dreyfus, L.R. 5 Ch.Div. 605. In the latter case there was a special hypothecation for the payment of the principal and interest of certain bonds

of the Peruvian Republic. Among the securities for the bonds were the surplus proceeds of guano to be imported and sold in London. Guano was sent to England and sold for the purpose of paying the interest; there was default and failure to pay. The English court held that a suit to require the use of the money for the payment of the interest was an attempt to attach the property of a foreign state in the hands of its agent and that, as the court had no power to deal with the sovereign as a party, the court could not deal with the agent or with the property in the hands of the agent.

And in United States ex rel. Goodrich v. Guthrie, 17 How. 284, 15 L.Ed. 102, Justice Daniel, speaking for the court, said the only instances in which the heads of departments of the government can be controlled, are with reference to acts or proceedings not implied in the several and inherent functions and duties incident to the office—acts of a character rather extraneous, and required of the individual rather than the functionary.

In the instant case the acts and proceedings which are here sought to be controlled are those which *are* implied in the inherent duties and functions of the offices of the appellees. Indeed, they are their ordinary duties. Here there is nothing extraneous to the offices; nothing is required of the individual. The things to be done are required entirely of the functionary and not at all of the individual. And so we are brought back to the rule that, if the suit is against the officer in his official character and the claim made upon him, likewise in his official character, the United States are indispensable parties. See Governor of Georgia v. Madraza, 1 Pet. 110, 7 L.Ed. 73. If the suit is against the officers as individuals only, and the offices they hold are given merely to describe them as persons, they have no interest in the subject-matter and no decree can go against them. McCauley v. Kellogg, Fed. Cas.No. 8,688, 2 Woods, 13.

And there is nothing in Osborn v. Bank of United States, 9 Wheat. 738, 6 L.Ed. 204, to the contrary. In that case the Bank of the United States maintained two branches of the bank in Ohio. The Ohio Legislature imposed exorbitant taxes upon them to expel them from the state, and the auditor was empowered to appoint agents to make seizures of the bank's prop-

erty and to dispose of it if there was a default of payment. Before the taxes were payable the bank procured an injunction against the auditor and his agents. In spite of this, seizure was made of a specific sum of money consisting of specie and bills and while these were in possession of the officers a writ of injunction was served, commanding the officers not to dispose of the money, but to hold it subject to the order of the court. Thus the court had jurisdiction of the officers who seized and had actual possession of the money; and the court stated the true question in the case to be whether these officers were to be considered as having a real interest or as being merely nominal parties. On the hearing, the officers were held to be trespassers and were ordered to restore the property they had taken without lawful authority in the same form in which it had been taken. The ground of the decision was that they then had the money in their actual, physical possession, and it was on this ground that it was held the state of Ohio was not a necessary party.

The present case is wholly different. The persons here sued were not trespassers. It is not charged they committed any wrong against appellant or that they have any personal interest in the suit. Nor is it or can it be charged that they have themselves possession or control of the money which appellant claims was unlawfully exacted; and obviously there can be no recapture of the specific money paid by appellant in a suit against them in trespass, trover, or detinue. The only way in which they can make restitution is in doing some act contrary to their official power and duty. In the Osborn Case the defendants were, as we have seen, adjudged to have been trespassers. They were alike and together and apart liable to restore the precise specie and bills they had taken. The seizure by them had been in defiance of an injunction of the court, and the fruits of their wrongful act were in their hands, and the decree that they should return the money in the same form in which it was taken was obviously within the power of a court of equity. No more than that was decided. Poindexter v. Greenhow, 114 U.S. 270, 330, 5 S.Ct. 903, 962, 29 L.Ed. 185, 207; Atchison, T. & S. F. R. Co. v. O'Connor, 223 U. S. 280, 32 S.Ct. 216, 56 L.Ed. 436, Ann.Cas. 1913C, 1050; Reagan v. Farmers' L. & T. Co., 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014, and Smyth v. Ames, 169 U.S. 466, 18

S.Ct. 418, 42 L.Ed. 819, are not in point for the reason we have endeavored to explain; namely, that in this case the money which it is the object of the suit to recover is in the Treasury of the United States and cannot be withdrawn therefrom otherwise than by an act of the Legislature. To require, therefore, as the bill prays, that the Secretary of the Treasury and Treasurer pay over the money to appellant would be directly to coerce the United States. In other words, it would be an undertaking upon the part of the court to administer the affairs of government, and this a court has no power to do.

The United States are the only parties in responsibility and interest, and the law has made no provision for the substitution of other parties to represent them; nor for an inquisition into their affairs in their absence; nor for a curator ad hoc nor guardian ad litem to answer for them.

Nor could this court execute its decree if it made one in favor of appellant, because the subject-matter of the suit—the money—is beyond the control of the court.

■■■ This is not a case of an agent of the government threatening to invade the rights of a citizen and justifying his action on the basis of supposed authority in a law, for in such case the wrong, if without proper authority, is the personal act of the officer, and may be enjoined. Nor is it a suit for the purpose of requiring an officer to perform a plain ministerial duty, for likewise in such a case a court may compel him to perform the duty. Nor is it a case in which specific property is found in the hands of an officer and claimed to have been illegally exacted, for in such a case the court may impress a lien on it and require its return. But, as we have already pointed out, what is sought here is to compel the court to assume the legislative and executive authority of the United States and in effect enact a law to restrain and control the use of money in the treasury and direct the officers of the government to carry it into execution. This may not be done. Belknap v. Schild, 161 U.S. 10, at page 18, 16 S.Ct. 443, 40 L.Ed. 599.

Second. We are of opinion that appellant had a plain, adequate, and complete remedy at law. Appellant is here seeking to recover amounts paid by it to the government under section 602½ of the Revenue Act of 1934. Subsection (f) of that section (26 U.S.C.A. § 999 (f) reads: "All provisions of law (including penalties) applicable in respect of taxes imposed by section 600 of the Revenue Act of 1926 [sections 1120 (a) (b) and 1124 (a)] shall, insofar as applicable and not inconsistent with this section, be applicable in respect of the taxes imposed by this section."

■■■ Among the provisions of law that are applicable to section 600 of the Revenue Act of 1926 (26 U.S.C.A. §§ 1120, 1124 (a), are sections 3220, 3226, and 3228, R.S., as amended (U.S.C.A., title 26, § 1670 (a) (1), (b), §§ 1672–1673, 1433). R.S. 3220, as amended (26 U.S.C.A. § 1670 (a) (1), provides that "except as otherwise provided by law in the case of income, estate, and gift taxes, the Commissioner, subject to regulations prescribed by the Secretary, is authorized to remit, refund, and pay back all taxes erroneously or illegally assessed or collected, all penalties collected without authority, and all taxes that appear to be unjustly assessed or excessive in amount, or in any manner wrongfully collected." This section and the accompanying sections have been held by the Supreme Court to afford an adequate remedy for the recovery of invalid taxes. Dodge v. Osborn, 240 U.S. 118, 36 S.Ct. 275, 60 L.Ed. 557. Appellant's bill charges that demand has been made upon the Commissioner of Internal Revenue and refused. It was, therefore, in position to bring its suit. Under the applicable provisions, the statute of limitations will not apply for a period of four years. There was, therefore, no question of emergency growing out of lack of time in which to bring the suit, and nothing is shown with relation to the charge of a multiplicity of suits which would render the relief provided by the statute inadequate. The fact that there are other persons similarly situated with appellant who would have to sue separately does not create a situation which would justify a court of equity in saying that the remedy is inadequate. The case of Dodge v. Osborn, supra, answers this contention adversely to appellant's claim.

■■■ Only one further contention need be noticed. It is argued by appellant that, because the money collected on account of the illegal tax is not covered into the treasury as other public funds, but is called a trust fund, the sections of the law which we have cited providing a right of recovery have no applicability. The Act of

June 26, 1934, 48 Stat. 1232, § 18 (31 U.S. C.A. § 725q), is cited to sustain this view. We think there is nothing there to the point, and we accept as true the statement in the brief of the government that the fact that the money is set apart in a special fund after it is paid into the treasury can make no difference.

Here the record shows that the money was collected as a tax and was paid into the Treasury of the United States. It was exacted as a tax and, when paid, was money of the United States. Congress, however, apparently in recognition of an obligation assumed in the act granting Philippine independence not to restrict the importation of Philippine oil, declared that the fund collected from its processing should be paid to the Philippine government. Obviously the purpose of the tax was to retard and diminish, contrary to the agreement, the quantity of oil brought into the United States; and the appropriation to the Philippine government of the money derived from the tax was presumably regarded by Congress as the recognition of an honorable obligation growing out of a change of policy which it was assumed would affect injuriously a product of the Islands. But it cannot be doubted that Congress has the power to change the use and disposition of the fund if it should consider that course necessary and proper. Or that it could rescind its former action and decline to recognize the obligation. Certainly the Philippine government has no vested interest in the fund. Hence it is still public money of the United States which, as the bill alleges and the United States agree, has been covered into the Treasury of the United States and physically mingled with the other moneys of the United States. If, in these circumstances, it should subsequently appear that it was exacted under an unconstitutional act, the United States have supplied an adequate and appropriate remedy for its recovery in the statutes to which we have referred; and the fact—if it should later turn out to be a fact—that the money has been paid to the government of the Philippines, would not defeat the remedy. Under existing statutes the liability of the United States to make restitution would be unaffected. See Becker Steel Co. v. Cummings, 296 U.S. 74-81, 56 S.Ct. 15, 80 L. Ed. 54.

Affirmed.