**CUMMINGS, U. S. Atty., v. HARDEE.**

**No. 7127.**

United States Court of Appeals for the District of Columbia.

Argued Dec. 8, 1938.

Decided Jan. 23, 1939.

Harry LeRoy Jones, of Washington, D. C., for appellant.

Swagar Sherley, Charles F. Wilson, H. B. Weaver, Jr., and George B. Springston, all of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

GRONER, C. J.

This is an appeal by Homer S. Cummings, Attorney General of the United States, as successor in interest to the Alien Property Custodian, from a final decree and order of the District Court granting the plaintiff's (appellee's) motion to strike certain parts of defendant's (appellant's) answer and entering judgment pro confesso for the plaintiff. The suit was instituted by the receiver of the Commercial National Bank of Washington, D. C., against the Attorney General and a number of other defendants. In each case decree went for the receiver. The appeals of the defendants Inland Waterways Corporation, United States Shipping Board Merchant

624

Fleet Corporation, Harry H. Woodring, Secretary of War, and others, were heard together and decided on a separate record by this court October 31, 1938.[1] The decrees were affirmed. In each case, including the present one, the purpose of the suit was to recover preferential payments made by the bank after insolvency. The bill alleged that each defendant had deposited sums of money with the bank, that the bank had unlawfully pledged part of its assets to each defendant to secure the deposits; that the bank thereafter became insolvent and a receiver was appointed to administer its assets, that the receiver, acting under mistake of law, redeemed part of the pledged assets at their full value; and that defendants sold the remaining part to satisfy the bank's indebtedness in full. The prayer of the bill in this case is that the defendant be declared trustee for the benefit of the receiver for the sums received from the sale and that the receiver have a decree for the amount thereof, with interest.

Admittedly the deposits were to the account of the Alien Property Custodian and consisted of money derived from two per cent. deductions from alien property, authorized by statute to be made upon return of the property to former enemy owners.[2]

The final decree of the District Court gave judgment against Homer S. Cummings,[3] Attorney General, as successor to the Alien Property Custodian, for the sum of $88,556.56, with interest from December 1, 1937, until paid, representing a balance of principal in the sum of $64,852.85 after deducting dividends at the rate paid unsecured creditors, and interest thereon in the sum of $23,703.71.

Nine grounds of error are relied on, but in the view we take of the case it is necessary to discuss only one of them.

The answer of the Attorney General alleged that the United States were the sole and absolute owners of the moneys deposited by the Alien Property Custodians in the bank and that the moneys were public moneys; that the moneys received from the sale of the pledged securities were when received deposited in the Treasury of the United States and credited to "Secretary's Special Deposit Account No. 8" and commingled with other funds of the United States; that this account is subject only to the check of the Secretary of the Treasury; that the Attorney General has not now and never has had the physical custody or possession of or any interest in the moneys received by the former custodian from the sale of the pledged securities. On these grounds the Attorney General insists that if the decree is to be considered one against him in his individual capacity, it is erroneous because he admittedly had no individual interest in the subject matter and, if it is to be considered one against him in his official capacity, it is invalid because not authorized under any of the provisions of the Trading With the Enemy Act, as amended, 50 U.S.C.A. appendix § 1 et seq.

We think the first ground may be eliminated, for obviously the decree is only against the Attorney General as Acting Alien Property Custodian, and the judgment is in effect to require him to exercise his official control over alien property funds in the Treasury of the United States. The case in this aspect differs from the cases decided in October in at least one major respect. In the cases of the Fleet Corporation and Inland Waterways Corporation, although the deposits were moneys of the United States and the proceeds of the pledge had been covered into the Treasury, they were, as corporations, the actual wrongdoers, suable in their individual capacities and therefore liable to judgment for conversion of the illegal pledge; and in the case against the Secretary of War, as custodian of the postal funds of the Panama Canal Zone, the proceeds of the pledged securities were not moneys of the United States and had not been covered into the Treasury but were still in his possession and control, and the suit was therefore for the recovery of a specific res unlawfully in the custody of an official of the Government. In the present suit, as we have seen, not only is it alleged that the deposits in the bank were moneys of the United States, but the proceeds of the securities pledged to secure the deposits were deposited in the Treasury of the United States and commingled with the funds of the United States, and in this aspect the question for decision is whether the District Court had jurisdiction to enter a de-

[1] Inland Waterways Corporation et al. v. Hardee, Receiver, 69 App.D.C. 268, 100 F.2d 678.

[2] Trading With the Enemy Act, sec. 24,

50 U.S.C.A. Appendix § 24, 11 F.C.A., Tit. 50, sec. 24 (25).

[3] Mr. Cummings resigned Jan. 2, 1939.

cree for the restoration of the money—conceding the contract for deposit-security to have been illegal—without the consent of the United States to be sued. We think the answer to the question is to be found in our decision in Haskins Bros. & Co. v. Morgenthau, 66 App.D.C. 178, 85 F.2d 677, certiorari denied, 299 U.S. 588, 57 S.Ct. 118, 81 L.Ed. 433. It is quite true that in the case of O'Connor v. Rhodes, 65 App. D.C. 21, 79 F.2d 146, 151—which was a previous suit brought by a depositor of the Commercial National Bank against the Attorney General as Alien Property Custodian and a number of other defendants to recover on these same causes of action—we said on an appeal from a decree overruling defendant's motion to dismiss the bill:

"The occasion for naming the Attorney General as one of the defendants arose out of the fact that by an Executive order he became the successor in interest to the Alien Property Custodian. The bill alleges that the Custodian obtained from the receiver of the bank a sum of money in excess of that to which he was legally entitled, and the bill further alleges that the Attorney General has received and controls the money so illegally obtained by his predecessor. As we have already pointed out, the fund deposited in the bank by the Alien Property Custodian consisted of money made up by the deduction of 2 per cent. of the value of property and money of alien enemies under the general provisions of the Trading with the Enemy Act (50 U.S.C.A. Appendix § 1 et seq.). We have had occasion to notice the conditions under which the fund was accumulated by the Custodian, and we have always assumed that the fund was a guaranty fund to cover the expense of administration and that the balance after the payment of expenses, if any, would be returned to the several trusts and distributed to the owners. It is a fund exclusively under the control of the Acting Custodian. It is not money of the United States paid into the Treasury of the United States."

■ Hence we did not consider the suit as one against the United States. That case was subsequently dismissed, and the present suit for the same purpose was instituted by the receiver. But it should be observed that our former decision was based upon the facts appearing in the bill of complaint in that suit, and these facts showed that the fund being sued for—the proceeds of the pledge—was then a fund

exclusively under the control of the Attorney General; that it was not money of the United States; was held by the Attorney General; and had not been covered into the Treasury of the United States and commingled with the moneys of the United States. The contrary appears on the appeal in the present suit. We do not, therefore, regard O'Connor v. Rhodes, supra, as establishing the law in this case or, in view of the circumstances, as controlling.

■ On the facts now shown, we think that the money deposited in the bank was unquestionably money of the United States, and that the judgment in this case can be satisfied only by payment of money out of the United States Treasury. As to the first proposition we did, as in the O'Connor case, express a contrary view in Deutsche Bank v. Cummings, 65 App.D.C. 297, 83 F.2d 554. There we said that legislation on the seizure of alien property, passed in the exercise of the war power of Congress, indicated no purpose of confiscating to the use of the United States enemy property found within the country; that, while the power to confiscate existed, it had never been exercised; and that, until exercised, the seizure and retention of alien property created only a trusteeship and did not change title. We thought we were justified in this conclusion by the language of the statutes and the declarations of the Executive Departments on the subject of confiscation, but on appeal to the Supreme Court (300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545) our views were disapproved, and it was held that alien enemy owners were divested of every right in respect of money and property seized and held by the custodian during the war and that the title to the same upon seizure became absolute in the United States. In this view it follows (in the light of the facts here) that the suit to recover the proceeds of the pledge made to secure the deposit is in substance a suit against the United States. Cummings v. Societe Suisse Pour Valeurs De Metaux, 66 App.D.C. 121, 85 F.2d 287; Cummings v. Deutsche Bank, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545; Banco Mexicano v. Deutsche Bank, 263 U.S. 591, 603, 44 S.Ct. 209, 68 L.Ed. 465. Here, as we have pointed out, the deposits were made by a former Alien Property Custodian, and the bonds pledged as security had been held by a former custodian and converted by him into money which he deposited in the Treasury. The Attorney General did not

demand the pledge, did not receive the security, and did not participate in the deposit of the proceeds of the pledged assets in the Treasury of the United States.

But the receiver insists that this is of no consequence since, as he claims, the proceeds of the pledge—though in the Treasury—are earmarked for "the account of the Attorney General, Alien Property Bureau", and are therefore subject to his order; and that, since the Alien Property Custodian has authority to pay the necessary expenses incurred by him in the general administration of his office, and since the original deposit in the bank was made in connection with the general administration of the Alien Property Bureau, the

pledge of securities was correlative to the deposits; and that the sale of the securities and retention of the proceeds was an incident to general administration; and that consequently, since the money was wrongfully received, the repayment thereof is an obligation incurred by the Alien Property Custodian in the administration of his office, and the Attorney General, as his successor, has the power and duty to make repayment by withdrawal of a sufficient sum from the Treasury. But we think this conclusion by no means follows. Congress has specifically prohibited the payment of alien property money deposited in the Treasury except pursuant to the provisions of the Trading With the Enemy Act, as amended.[4]

---

4 "§ 7. * * * (c) * * * The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this Act, and in the event of sale or other disposition of such property by the Alien Property Custodian, shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States." 40 Stat. 1020, 50 U.S.C.A. Appendix, § 7(c).

"§ 9 (a) Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, or to whom any debt may be owing from an enemy or ally of enemy whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States may file with the said custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; and the President, if application is made therefor by the claimant, may order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States, or of the interest therein to which the President shall determine said claimant is entitled:

Provided, That no such order by the President shall bar any person from the prosecution of any suit at law or in equity against the claimant to establish any right, title, or interest which he may have in such money or other property. If the President shall not so order within sixty days after the filing of such application or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may institute a suit in equity in the Supreme Court of the District of Columbia or in the district court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal place of business (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or the interest therein to which the court shall determine said claimant is entitled. If suit shall be so instituted, then such money or property shall be retained in the custody of the Alien Property Custodian, or in the Treasury of the United States, as provided in this Act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant, or by the Alien Property Custodian, or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered

Section 7 of the Act gave the Alien Property Custodian authority to seize enemy property and, as we have pointed out, the seizure when lawfully made transferred title absolutely to the United States. Section 9(a), as supplemented by Section 30, 50 U.S.C.A. appendix, § 30, 11 F.C.A., Tit. 50, sec. 24(31), gave to a non-enemy owner of property seized the right to recover it by suit in a federal court, and Section 7(c), denied all other remedy. The Act, taken as a whole, establishes a definite code in relation to seizure of enemy property.[5] As construed by the Supreme Court, its effect was by the seizure to transfer title from the alien to the United States, with a reservation, however, that if the seizure was erroneous and the property was not enemy-owned, its recovery could be secured in a suit brought by the owner against the Alien Property Custodian or the Treasurer as agents of the United States,—but forbidding a suit brought to recover the seized property or its proceeds in any other circumstances. If this is a correct construction of the Act, it is evident that consent of the United States to be sued in the circumstances we are considering is wholly lacking, for this is not a suit brought by a non-enemy owner to recover possession of property seized in the belief that it was enemy-owned, and in that case alone has Congress consented that the United States may be sued as to such seized property. This is a suit to recover the proceeds of securities unlawfully pledged to the custodian to secure deposits of money of the United States. These proceeds are no longer in the hands of the custodian but have been covered into the Treasury in accordance with the positive mandate of the Act[6] and, since the United States have not consented to be sued except in accordance with Section 9 of the Act, we know of no way in which a suit under the general equity jurisdiction of the court for their recovery can be maintained. Crone v. Sutherland, 62 App.D.C. 16, 63 F.2d 895. If this were a suit for mandamus against the Attorney General to require him to withdraw the funds from the Treasury and restore them to the bank, it would not be sustainable for the reason that Congress has not conferred authority on the Attorney General to withdraw them, for the asserted right to the use of money in the payment of the expenses of administration is a far cry from the right to withdraw it in satisfaction of a judgment for a tortious conversion. Reeside v. Walker, 11 How. 272, 290, 13 L.Ed. 693. No principle is better established than that moneys in the Treasury can be withdrawn only by a Congressional appropriation. Referring to this in the Haskins Bros. case, supra, we said that the duties of the Secretary of the Treasury and the Treasurer are to receive and preserve the public money and not to disburse it except conformably to law, that as officers of the United States they have no right or estate in the public money whether earmarked as a special fund or as part of the general fund; that they are in effect mandataries of a limited and defined commission. In that case, as in this, it was alleged that the earmarked fund in the Treasury was money belonging to the claimant, but in that case, as in this, it was in the Treasury and not in the hands of the officer who it was claimed had illegally

---

against the claimant or suit otherwise terminated." 42 Stat. 1511, 50 U.S.C.A. Appendix § 9(a).

"§ 30. Any money or other property returnable under subsection (b) or (n) of section 9 shall, at any time prior to such return, be subject to attachment in accordance with the provisions of the code of law for the District of Columbia, as amended, relating to attachments in suits at law and to attachments for the enforcement of judgments at law and decrees in equity, but any writ of attachment or garnishment issuing in any such suit, or for the enforcement of any judgment or decree, shall be served only upon the Alien Property Custodian, who shall for the purposes of this section be considered as holding credits in favor of the person entitled to such return to the extent of the value of the money or other property so returnable. Nothing in this section shall be construed as authorizing the taking of actual possession, by any officer of any court, of any money or other property held by the Alien Property Custodian or by the Treasurer of the United States. (Oct. 6, 1917, c. 106, § 30; Mar. 10, 1928, c. 167, sec. 15, 45 Stat. 275.)" 50 U.S.C.A. Appendix § 30.

[5] All the statutes which relate to the seizure of alien property and its administration by the custodian are collected in, 50 U.S.C.A. Appendix § 1 et seq., 11 F.C. A., Tit. 50, sec. 24(1) et seq. The original Trading With the Enemy Act, 40 Stat. 411 (1917), was amended from time to time and was supplemented by the Settlement of War Claims Act, 45 Stat. 254 (1928).

[6] Sec. 12, 50 U.S.C.A. Appendix § 12, 11 F.C.A., Tit. 50, sec. 24(12).

exacted it. We answered this by saying that to require its withdrawal from the Treasury would be to usurp the legislative function of appropriation and that this could not be done.

■ Nor can the suit be maintained against the Attorney General, either personally or in his official capacity, on a showing that a predecessor in office had illegally collected the money and placed it in the Treasury. The Attorney General is not shown to have done anything in his personal capacity in relation to the matters out of which this suit arose. The events all occurred in the administration of a predecessor. The Attorney General did not receive the fund in the first instance, and in this view he cannot be charged personally in an action for money had and received. Smietanka v. Indiana S. Co., 257 U.S. 1, 42 S.Ct. 1, 66 L.Ed. 99. Nor has he now possession of the fund, and so cannot be sued in his official capacity in a possessory action, Haskins Bros. & Co. v. Morgenthau, supra, at page 683, of 85 F.2d; and since under the provisions of the Trading With the Enemy Act he has no authority to withdraw the fund except for specified purposes named in the Act and there is no other law permitting its withdrawal, he cannot be sued at all, for such a suit is in effect a suit against the United States. Haskins Bros. & Co. v. Morgenthau, supra. It is obvious, therefore, that—without considering whether the bank has a right of action against the former Alien Property Custodian because it has been injured by his wrongful act—the present suit is necessarily one against the United States, and in that aspect it cannot be maintained against an agent of the United States so long as he is acting as agent. The surveyor of the highways, who is a servant of the inhabitants of the county, is not responsible for the nonperformance of their duties or for the negligence of their servants though he is the person who acts for them, even though the inhabitants of the county cannot themselves be sued because they are not a body corporate. It is, therefore, in our opinion of no consequence whether the act of the former Alien Property Custodian was or was not lawful. The fact that he collected the proceeds of the pledged bonds and deposited these in the Treasury fixes the status of the money and renders the Attorney General impotent to withdraw it and disburse it unless and until directed to do so by an Act of Congress or until the United States shall submit to be sued to determine its disposition.

In our view the decision and decree of the lower court are wrong and should be, and are, reversed.

Reversed.