In re MEYER et al.

Petition of MEISCH MFG. CO.

(District Court, E. D. New York. February 16, 1901.)·

1. ASSIGNMENT FOR BENEFIT OF CREDITORS — RETURN OF CONSIGNED GOODS — RIGHT OF CONSIGNOR TO SET-OFF AGAINST ADVANCES.

A principal demanding a return of consigned goods from his factor's general assignee, upon which the factor had made advances, is not entitled to offset against such advances unmatured notes held by a third person made by the principal for the personal accommodation of the factor, and indorsed by him, especially when it does not appear that the notes had any relation to the business existing between the principal and factor.

2. PAYMENTS—RIGHT TO RECOVER—DURESS.

Duress involves illegality, and where one having in his possession property of.another demands as a condition of its restoration the payment of a sum for which he is legally entitled to a lien thereon, the owner cannot be said to have made such payment under duress, so as to give him any right to its recovery on that ground.

3. BANKRUPTCY—RIGHT OF CREDITOR TO PREFERENCE—DISALLOWANCE OF OFFSET. BY BANKRUPT'S ASSIGNEE.

A general assignee of a factor came into possession of goods which had been consigned to such factor for sale, and upon which he had made advances. The consignor, a manufacturing corporation, demanded a return of the goods, and claimed the right to offset against the advances received thereon the amount of certain unmatured notes, which it had given to the factor as a personal accommodation, and which had been indorsed by the factor, and discounted, and were then held by a third party. The assignee, in accordance with his duty under the law, refused to allow such offset, and required the corporation to pay the full amount of the advances, which it did under protest. The factor was subsequently adjudged a bankrupt, and the property and money in the hands of the assignee were turned over to the trustee in bankruptcy. Having paid the notes on their maturity, the corporation presented a claim to the court of bankruptcy for repayment of the amount from the funds in the hands of the trustee. Held, that as it was not entitled to an offset of the amount at the time it made the payment to the assignee, and the latter demanded and received only what he was legally entitled to, the corporation, by subsequently taking up the notes, acquired no right to reclaim any part of such payment, or to follow the money into the hands of the trustee, by whom it was rightfully received as a part of the bankrupt's estate; and that there was no ground, either of fraud, duress, or mistake, which gave the corporation any equity to be preferred over the other creditors of the bankrupt.

In Bankruptcy. On petition of the. Meisch Manufacturing Company.

Goepel & Raegener (Norbert Heinsheimer, of counsel), for petitioner.

Strong & Cadwalader, for assignee.

F. W. & A. E. Hinrichs and Kurzman & Frankenheimer, for creditors.

THOMAS, District Judge. Charles H. Meyer, Henry L. Meyer, and Joseph R. Dickinson, under the firm name of Meyer & Dickinson, were commission merchants at Philadelphia. The Meisch Manufac-

turing Company made silks at Paterson, N. J. Henry L. Meyer was president and Charles H. Meyer was treasurer of the corporation, and the latter was the practical ruling force in the firm and company. The company consigned to the firm for sale all its product, on which advances were customarily made. On August 14, 1898, Charles H. Meyer died, and on August 19th following the firm made a general assignment in Pennsylvania to Charles W. Sparhawk, of Philadelphia, and on August 24, 1898, made a similar assignment in New York. On April 11, 1899, the firm was adjudicated bankrupt upon a petition filed against it on December 16, 1898. At the date of the assignment the firm held consigned goods of the company of the value of $65,000, and the books of the firm and the company prove that the firm had advanced on these goods the sum of $41,338.77, which accords precisely with a statement of account rendered by the firm to the company upon July 1, 1898, which makes no mention of the proceeds of the two notes soon to be mentioned. Following the assignment, the company sought a return of the goods, the value of which would deteriorate in default of an early sale; but the assignee refused to make such redelivery without a payment of the sum of $41,336.77 advanced. The company insisted that the said sum should be reduced by a set-off of the two unmatured notes, but on August 29, 1898, paid the whole sum advanced, and on the same day expressed its protest and claim in the following letter:

"Mr. Charles W. Sparhawk, Assignee of Meyer & Dickinson: In order to procure delivery to us of our goods in your hands as assignee of Meyer & Dickinson, we have paid you the full amount of advances of Meyer & Dickinson against the same, amounting to forty-one thousand three hundred and thirty-eight and $77/100$ (41,338.77) dollars. We make this payment under protest, claiming the right to offset against such amount the notes made by us for the accommodation of said Meyer & Dickinson, amounting to twenty thousand dollars ($20,000), which are not yet due; and the payment made by us as above stated is not to be taken as a waiver of any right to offset.

"[Sgd.]                     Meisch Manufacturing Co.,
                                "Henry L. Meyer, Prest."

The notes were made by the company to the order of the firm, and were discounted by the company at a bank at Paterson in May and June preceding the assignment. The proceeds were remitted by the company's check to the firm, but no entry thereof was made either on the books of the firm or the company, except as the notes appear as bills payable on the books of the firm. This failure to notice the notes or proceeds thereof in the statement of account, or as a charge or credit on the books of either the firm or company, tends to show (1) that the transaction did not relate to the commission business existing between the parties; (2) that the money received was not intended for compensation for advances. It will now be observed that in the month of August, 1898, the company was entitled to obtain a redelivery from a factor's assignee of certain consigned goods upon which advances of a definite undisputed amount had been made; that the company paid back the exact advances, and received the goods; that the company at the time claimed the right to offset its liability on certain unmatured notes made by it for the accommodation of the

firm, to which the proceeds had been paid; and that the firm was liable as indorser, and, as between it and the company, primarily liable on the notes. Hence the first inquiry is: May a principal, demanding the return of consigned goods from his factor's general assignee, offset against the advances made on the goods unmatured notes held by a third person, made for the personal accommodation of the person who is the factor, and indorsed by him, especially when it does not appear that the notes or the proceeds related to the business existing between the principal and factor? This may be illustrated as follows: If the value of the goods be $65,000, the advances $65,000, and the unmatured notes made for the accommodation of the firm $65,000, may the company take the goods without payment of any sum upon the claim that it will be obliged to take up the notes at maturity should not the firm do so? Had the assignee consented to such proposition, he would have violated his plainest duty. The whole value of the goods in the supposed case (in the actual case present $^{41}/_{65}$ of such value) belonged to the estate, which it was the duty of the assignee to administer and to distribute. If he turned these assets over to the company without payment, it would be upon an agreement or expectation that the company would pay the notes. In default of such payment the company would have the goods, the bank would have a claim against the assignee for the notes, so that, in legal theory, the company proving worthless, the assignee would have lost $65,000 of assets, and would have paid, or have been liable to pay, $65,000 in addition, with no source of recoupment save the corporation; and it is not too much to add that the assignee would have paid by compulsion a like sum to the creditors for his culpable waste of the estate. The absurdity of the company's demand to deduct the notes from the advances is further illustrated by Messrs. Hinrichs' brief, showing to what extremities the assignee would be reduced provided the company became insolvent after receiving the goods, and before the payment of the notes. Neither a court of law nor equity would subject an estate to such denudement. Light is further thrown upon the matter if the supposition be indulged that there had been no assignment, and the company had sought the return of the goods before paying the notes. Of course, the notes could not be deducted, and so, if the firm had sold the goods before maturity of the notes, or the assignee had done the same, and the company had sought to recover the amount paid by it on the notes, in such case only the recovery would be allowed as would be due to a general creditor. Of course, it should be noticed in this connection that the insolvency of one of two mutual debtors brings a new and important element into a question of equitable set-off. But the fact is that the assignee held a special property in the goods to the extent of $^{41}/_{65}$ of their value; the company was privileged to acquire that property by paying for it, but it could not pay in a contingent liability which it might never discharge. Therefore the assignee in demanding full payment of advances did only what he had a right to do, what the local law required him to do, and his action was in accord with usual rules. Chance v. Isaacs, 5 Paige, Ch. 592; Beckwith v. Bank,

9 N. Y. 211; Fera v. Wickham, 135 N. Y. 223, 31 N. E. 1028, 17 L. R. A. 456; Chipman v. Bank, 120 Pa. St. 86, 13 Atl. 707. Hence there was no duress.

What is duress? "The duress for which a person may avoid any contract or conveyance made, or recover back any money paid under its influence, exists where one by the unlawful act of the beneficiary or his authorized agent, or by the act of some person with his knowledge, is constrained under circumstances which deprive him of the exercise of free will to agree or to perform the act sought to be avoided." 10 Am. & Eng. Enc. Law, 321. This definition illustrates that the act which coerces the complaining person must have been an unlawful one, and so it should be. If one person exercises simply the right which the law gives him with reference to the person or property of another, it cannot be said that he unlawfully coerces the other. Duress involves illegality. In the present case the assignee did not threaten to sell the goods of the company either at an undue or inconvenient season, or without sufficient notice, or in an illegal manner, or contrary to the rules and customs of the locality. He simply said that, if the advances were not paid, he would exercise his right to enforce the lien. All this was but a statement of his just rights, and, if he had stated less, or had done less, he would then have been lacking in duty. Therefore, upon the question of duress, the whole matter comes back to this: was the assignee bound to accept repayment of the advances with a deduction on account of the unpaid notes? It is quite apparent that it was not his duty. But, even so, it may be urged that it would be unconscionable for a court of bankruptcy, succeeding to the estate, to retain the money. Why? The money has not found its way into this court by reason of any mistake, either of law or fact, as was the case of Ex parte James (In re Condon) 9 Ch. App. 609, or Ex parte Simmonds, 16 Q. B. Div. 308. There has been no misunderstanding of its rights on the part of the company, as was the case in Re Myers (D. C.) 99 Fed. 691, and Oil Co. v. Hawkins, 20 C. C. A. 468, 74 Fed. 395, 33 L. R. A. 739. No money has been received which was subject to a set-off that either a court of law or of equity would have recognized. It is not a question of offsetting unmatured demands against a matured indebtedness when a debtor is insolvent, concerning which the federal courts have expressed frequent opinions. Scott v. Armstrong, 146 U. S. 499, 13 Sup. Ct. 148, 36 L. Ed. 1059; North Chicago Rolling Mill v. St. Louis Ore & Steel Co., 152 U. S. 596, 14 Sup. Ct. 710, 38 L. Ed. 565; Schuler v. Israel, 120 U. S. 506, 7 Sup. Ct. 648, 30 L. Ed. 707; Carr v. Hamilton, 129 U. S. 252, 9 Sup. Ct. 295, 32 L. Ed. 669. The notes were not discounted by the fraud of the bankrupts or any member of the firm, as was the case in Rothschild v. Mack, 115 N. Y. 1, 21 N. E. 726. There has been no error of fact created by any misapprehension or misrepresentation of the assignee, or any officer of the court of bankruptcy, as was the case in Louis Snyders' Sons Co. v. Armstrong (C. C.) 37 Fed. 18. There has been no payment of the debt after bankruptcy proceedings by a surety of the bankrupt and application made to offset the sum so paid against a debt due from the surety

to the estate, so as to bring it within the holding in Re Dillon (D. C.) 100 Fed. 627. The case is nearly illustrated by Chance v. Isaacs, 5 Paige, Ch. 592. It appeared that C. had received a note of I., and had indorsed the same to a third person, and I. held two negotiable notes against C. for about the same amount, which were payable a short time after the note which he had originally given to C. became due. I. became insolvent, and made an assignment for the benefit of his creditors, which assignment included C.'s notes, and C. was afterwards compelled as indorser to pay and take up the note originally given to him by I., and it was concluded that C. could not, in equity, offset the note so taken up by him against his own notes in the hands of the assignee. It was stated in the opinion that, if C. had been the owner and holder of I.'s note at the time of the assignment for the benefit of his creditors, he could have offset it against his own indebtedness, as the circumstance of the note not being due would not have impaired C.'s equitable right to a set-off in such a case. This last statement does not seem to accord with the law of New York or Pennsylvania. What equity, then, has the claimant? Who has wronged him in the past? By whose error has he been misled? What mistake of law or fact has he made from which he should be relieved? What has he done or suffered other than any other general creditor? By what right does he follow money into the hands of the trustee in this court, and identify it as his own, and demand specific return of it to him? It is possible for a bankruptcy court, acting arbitrarily in the name of equity, and in inequitable disregard of the rights of other creditors, to pass this large sum to the claimant. But the court should not disburse trust funds to a claimant unless it can point out distinctly some certain marked equity in his favor. The whole transaction was past at the time this court took jurisdiction. It had been concluded in accordance with the local law. This court succeeded to a fund obtained according to law and according to rules in equity. The claimant's present plea is that, if the facts had been then as they are now, and this court had been in control, an offset would be allowed; that is, if then the company had paid the notes, and thereupon demanded redelivery, an offset would have been permitted if a court of bankruptcy had been in control. That may be true, but the claimant's misfortune is that such conditions did not obtain, nor did he take measures to secure such a status. The company complied voluntarily with the law applicable to the facts as they then existed, and it is not the province of this court to act to-day as of the time of the redelivery of the goods, upon a state of facts since accrued, but at that time nonexistent. The law of the state of Pennsylvania, whether administered in a court of law or equity, required the payment of the entire sum advanced, and this court may not assert that observance of that law dishonors the tenure by which it holds the money in question. These views lead to a reversal of the order of the master.