**BANK OF THE PHILIPPINE ISLANDS,**
Plaintiff,

v.

William P. ROGERS, Attorney General,
and Ivy Baker Priest, Treasurer of
the United States, Defendants.

**PHILIPPINE NATIONAL BANK,**
Plaintiff,

v.

William P. ROGERS, Attorney General,
and Ivy Baker Priest, Treasurer of
the United States, Defendants.

Civ. A. Nos. 2752–56, 3521–56.

United States District Court
District of Columbia.

June 12, 1958.

Joseph B. Friedman and Melville E. Locker, Washington, D. C., for Bank of the Philippine Islands.

Matthew E. McCarthy, New York City, and Elwood H. Seal, Washington, D. C., for Philippine Nat. Bank.

George B. Searls, Victor R. Taylor and Sidney Harris, Dept. of Justice, Washington, D. C., for defendant.

TAMM, District Judge.

## I. *Nature of the Action.*

A. These actions arise under, and are brought pursuant to, the provisions of the "Trading With The Enemy Act" of October 6, 1917, as amended (50 U.S. C.A.Appendix, §§ 1–39, specifically Section 9(a)) and the Fifth Amendment to the Constitution of the United States.

B. There are two actions involved here, each action involving a different plaintiff, but with two defendants common to both cases. In Civil Action 2752–56, the plaintiff is the Bank of the Philippine Islands, a banking corporation duly organized and operating under the laws of the Philippine Islands, with principal office and place of business in Manila, Philippines. In Civil Action 3521–56, the plaintiff is the Philippine National Bank, a banking corporation duly organized, existing and operating under the laws of the Philippine Islands, with its principal place of business in Manila, Philippines. The two defendants involved in each action are William P. Rogers, the Attorney General of the United States of America and, as such, the successor to the Philippine Alien Property Administrator, and Ivy Baker Priest, Treasurer of the United States of America, who holds the property that is the subject matter of these proceedings.

C. The plaintiff in Civil Action 2752–56, the Bank of the Philippine Islands, and the plaintiff in Civil Action 3521–56, the Philippine National Bank, filed conflicting claims with the Philippine Alien Property Administrator of the United States, the predecessor of the defendant Attorney General, for a return of the vested property involved in this case. The vested property amounts to approximately ₱951,000 of pre-war Philippine currency, of which approximately ₱662,-000 was in Philippine Treasury Certificates, and ₱289,000 in Philippine Bank Notes. The order by which the funds

were vested by the Philippine Alien Property Administrator of the United States is Vesting Order P–285, which reads as follows:

"Vesting Order No. P–285
"Re: Sum of money owned by the
     Imperial Japanese Government
"Under the authority of the Trading with the Enemy Act, as amended, the Philippine Property Act of 1946 [22 U.S.C.A. § 1381 et seq.] and Executive Order No. 9818 [22 U.S.C.A. § 1382 note], and pursuant to law, the undersigned, after investigation, finding:

"1. That the property described as follows:

"The sum of ₱662,387.00 in Philippine Treasury Certificates, deposited with the accounts of Lt. Col. G. G. Woehrle, FD., Col. VO. No. 1715, May 1945 to the credit of General Fund Receipt 213897 and ₱289,000.00 in Philippine National Bank notes, presently in the possession of Major D. Arnhols, Executive Officer of the Fiscal Director, Philrycom, representing the balance of the money deposited by the Southern Regions Development Bank (Nampo Kaihaty Kinko) with the Philippine National Bank, Bacolod Branch, which were captured by the American Forces late in March 1, 1945,

is property within the Philippines owned or controlled by, payable or deliverable to, held on behalf of or on account of, or owing to, or which is evidence of ownership or control by, a designated enemy country (Japan);

"And having made all determinations and taken all action required by law, and deeming it necessary in the national interest,

"Hereby Vests in the Philippine Alien Property Administrator the property described in subparagraph 1 hereof, to be held, used, administered, liquidated, sold or otherwise dealt with in the interest and for the benefit of the United States, in accordance with the provisions of the Trading with the Enemy Act, as amended, and the Philippine Property Act of 1946.

"Any person, except a national of a designated enemy country, asserting any claim arising as a result of this Order may, within two years from the date hereof or within such further time as may be allowed, file with the Philippine Alien Property Administrator on Form PAPA–1 a notice of claim, together with a request for a hearing thereon. Nothing herein contained shall be deemed to constitute an admission of the existence, validity or right to allowance of any such claim.

"Executed at Manila, Philippines, on August 5, 1947.

"/s/ James McI. Henderson
/t/ James MCI. Henderson
Philippine Alien Property
     Administrator

"Filed with the
   Official Gazette:
   August 5, 1947      10:20 a. m.
   _____      _____
        Date              Time

"I hereby certify that the foregoing is a true and correct copy of an instrument on file in this office entitled "Vesting Order Number P–285."

The claim of the Bank of the Philippine Islands is limited to ₱638,000 of the Philippine Treasury Certificates, while the plaintiff Philippine National Bank claims the entire fund.

Subsequent to the filing of these claims, administrative hearings were held in the Philippines in 1948, 1949 and 1950, before the Philippine Alien Property Administration. Extensive testimony and approximately 40 exhibits comprised these hearings, with the testimony concluding in January, 1950. In January of 1952, a hearing examiner of the office of Alien Property denied both claims. Both plaintiffs appealed these decisions to the Director of the office of Alien Property and Assistant Attorney General of the United States who, on May 18, 1956, denied the claim of the Bank of the Philippine Islands in toto and partially allowed the claim of the Philippine National Bank in the amount of ₱172,000. The plaintiff Bank of the Philippine Islands applied to the Attorney General for a review of this decision,

but the application was denied. Plaintiff Philippine National Bank applied for a rehearing, but this was also denied.

On July 2, 1956, plaintiff Bank of the Philippine Islands instituted Civil Action No. 2752–56, in this court, pursuant to Section 9(a) of the Trading with the Enemy Act of October 6, 1917, as amended (50 U.S.C.Appendix, § 9(a)) and the Fifth Amendment to the Constitution of the United States. On August 23, 1956, plaintiff Philippine National Bank instituted Civil Action No. 3521–56 in this Court upon the same grounds. Subsequently, on November 8, 1957, these cases were consolidated for trial and were pre-tried on that date. This Court presided at the hearing de novo on the merits of these consolidated cases, said hearing having begun on March 25, 1958 and concluded on March 31, 1958.

## II. *Claim of Bank of the Philippine Islands.*

A. *Basis.* The claim of this plaintiff for a return of ₱638,000 of the vested property rests on the following allegations:

The Japanese Military Administration instituted a program early in 1943 which was aimed at winning the support of certain Filipino groups in the Visayan Islands. By this program, the Japanese would redeem in valid pre-war Philippine currency the emergency currency which had been issued by the Commonwealth Government of the Philippine Islands in December, 1941 prior to the Japanese invasion and which had been declared null and void by the Japanese. In order to carry out this program, the Japanese would require an adequate supply of pre-war currency. Therefore, the Japanese Military Administration through its agent, Nampo Kaihatsu Kinko (sometimes called the Southern Regions Development Bank, but hereinafter referred to as Nampo), issued an order which directed this plaintiff to turn over all of its pre-war currency to Nampo. This plaintiff complied with this order and turned over pre-war currency to Nampo, the Japanese agent, and in return received an equivalent amount of Japanese Military Notes. It is alleged by Bank of Philippine Islands that this transfer or exchange was effected by force and duress and was an unlawful taking and commingling of its money by the Japanese. This plaintiff further alleges that this currency, taken from them by force or duress, was sent by Nampo *through the Philippine National Bank, Manila,* along with other pre-war currency, to two branches of Philippine National Bank—one in Iloilo and the other in Bacolod. The Philippine National Bank was to act as an instrument of the Japanese in carrying out this redemption program.

After a partial use of this commingled fund by the Bacolod branch of the Philippine National Bank, the Japanese in March of 1945 ordered the Philippine National Bank to turn over the rest of the fund to the Bank of Taiwan, an agent of the Japanese Military Administration. Subsequently, the United States Armed Forces invaded the Philippine Islands. As the Japanese forces retreated, they buried this money in the mountains where it was found by the United States Army.

The claim of the Bank of the Philippine Islands to the vested funds rests mainly on the theory that since there was an unlawful taking by the Japanese, the latter did not acquire good title to the money taken from it and that the Bank of the Philippine Islands remained the true owner of said money, even to the time of vesting. In support of this, the Bank of the Philippine Islands relies on principles of the law of restitution which are substantially as follows:

"That when a person wrongfully mingles money of another with money of his own, the other is entitled to obtain reimbursement out of the fund." Rest. of Law of Restitution, Sec. 209.

and

"Where a person wrongfully mingles money of another with money of his own and subsequently makes withdrawals from the mingled fund,

the other is entitled to an equitable lien upon the part which remains and the part which is withdrawn or upon their product." Rest. of Law of Restitution, Sec. 211.

B. *Evidence Offered.* In support of its claim, the Bank of Philippine Islands offered testimony and exhibits. The testimony was furnished by Alberto F. DeVilla-Abrille who was the assistant cashier of the Bank of the Philippine Islands in 1943. A brief summary of his testimony shows that the Bank had Philippine Treasury Certificates in its vault in March, 1943 and pursuant to a letter from Nampo, the Bank of the Philippine Islands delivered under duress these Philippine Treasury Certificates to Nampo. He also stated that the Bank of the Philippine Islands received Japanese Military Notes from Nampo in exchange for the Philippine Treasury Certificates and that these notes were segregated from other cash and were not used, although they could have been used.

Bank of the Philippine Islands also introduced certain exhibits into evidence. Aside from the vesting order and the decision of the Assistant Attorney General, Dallas Townsend, some of the exhibits relate to the establishment of the Japanese Puppet Government, its functions, and the creation of the redemption program. The remaining exhibits attempt to connect the funds which the Bank of the Philippine Islands delivered to Nampo, allegedly under duress, with those funds found by the United States Army and subsequently vested by the Alien Property Administrator.

III. *Claim of Philippine National Bank.*

A. *Basis.* This plaintiff contends that prior to March, 1943 and subsequent thereto, its Manila office maintained a deposit account with Nampo. Then, in March, 1943, pursuant to the redemption program instituted by the Japanese, it withdrew ₱4,042,400 from this account and sent one/half of this sum to its branch at Iloilo and the remaining half to its branch at Bacolod to be used in the redemption program. This withdrawal consisted of Philippine Treasury

Certificates and Philippine Bank Notes in the sum of ₱3,618,000 and ₱424,000 in Japanese Military Notes. The sum of money that is involved in these actions is that which was sent to Bacolod.

The redemption program went into operation until sometime in October, 1943 when it was abandoned, but the unused currency remained in the Bacolod branch of Philippine National Bank. On March 2, 1945, the Japanese, through the Bank of Taiwan, confiscated all the Philippine currency which the Bacolod branch had in two accounts that had been set up at the time the redemption program was initiated. These two accounts were the Redemption Fund Account and the Operating Account. This currency was taken by the Japanese in their retreat, and subsequently at the end of March, 1945, United States Army forces found a group of boxes in the hills near Bacolod that contained Philippine Treasury Certificates and Philippine Bank Notes. It is this fund which this plaintiff claims it is entitled to recover.

Philippine National Bank alleges, in substance, that its books and records show that the vested property was, prior to the vesting, and still is, the property of the Philippine National Bank. Specifically, the Philippine National Bank says that the money sent to Bacolod and Iloilo to be used in the Redemption Program was always the property of the Philippine National Bank; that this is the money the Japanese seized in March of 1945 and that this is the same currency that was recovered by the United States Army forces and subsequently vested.

B. *Evidence Offered.* In support of its claim, the Philippine National Bank offered testimony and exhibits. The testimony was offered by Eusebio Villatuya who is presently the chief accountant for that Bank and who, in 1943, was chief statistician in the accounting department of the bank, and by Jose V. Buenaventura, presently a vice-president of the Philippine National Bank. Mr. Buenaventura, in 1941 and during the occupa-

tion, was acting manager of the Bacolod branch of Philippine National Bank.

Mr. Villatuya's testimony dealt chiefly with the accounting history of the claim involved. That is, he attempted to show that Philippine National Bank made deposits of Philippine Treasury Certificates and Philippine Bank Notes which it had in its vaults with Nampo in March of 1943, and that shortly thereafter, Philippine National Bank withdrew from this account ₱4,042,400 which was evenly distributed to its branches at Iloilo and Bacolod to be used in the Redemption Program. He also stated that Philippine National Bank set up accounts to reflect this Redemption Program and described various transactions and bookkeeping entries that were necessitated because of the program. His concluding testimony showed that this Redemption Program was terminated in October, 1943, and he stated that the Philippine currency that was not used in the Redemption Program at Bacolod, allegedly the property of the Philippine National Bank, was seized by the Japanese in March, 1945.

Mr. Buenaventura testified that he was the acting manager of the Bacolod branch of Philippine National Bank during the entire occupation and that he was personally acquainted with many of the events which took place regarding this fund. He also testified that he knew personally of the receipt of this fund; how it was recorded in the books at Bacolod; how it was used; how and when it was seized by the Japanese, and also testified as to his identification of the fund after the United States Army forces took possession.

The exhibits introduced into evidence by this plaintiff consisted mainly of orders and proclamations of the Japanese that dealt with the use and legality of various types of currency and also with the banking institutions. Also introduced into evidence were records of the Philippine National Bank showing, meticulously, pertinent transactions with respect to this fund and dealing specifically with the main office at Manila and the branches at Bacolod and Iloilo.

IV. *Position of the Defendants.*

The defendants maintain, and rightfully so, that in order for either plaintiff to recover in these suits one of them must show an interest, right or title in the vested property as is required by Section 9(a), Trading with the Enemy Act (50 U.S.C.A.Appendix, § 9(a). The defendants also carefully point out that since 1946 the exclusive remedy by which a "debt" as distinguished from a "right, title, or interest," may be recovered is a proceeding under Section 34 of the Trading with the Enemy Act. Thus, neither plaintiff could recover in this proceeding if the evidence showed a debtor-creditor relationship (i. e. bank depositor). Further, the defendants also make the following contentions:

1. Neither plaintiff proved that the vested money was the same money taken by the Japanese from the Bacolod branch of the Philippine National Bank on March 2, 1945.

2. The exchange by the Bank of the Philippine Islands of Philippine currency for Japanese Military Notes in March, 1943 was a valid transaction and, therefore, this plaintiff has no standing to bring this suit.

3. The Philippine National Bank, as a matter of law, was not the owner of the property involved, prior to vesting, for the reason that the Philippine National Bank parted with the money on March 2, 1945, by reason of a valid requisition made by the Japanese Army which, in effect, passed title to the Japanese. Moreover, the Philippine National Bank did not establish beneficial ownership.

4. Assuming that Philippine National Bank did establish beneficial ownership, it would still be barred from recovery as a matter of law for it must be deemed to be a public institution that is a part of the Government, and as such the Japanese could deal with it as with a government agency. Defendants conclude, consequently, that the Japanese could take possession of money in the posses-

sion of a government agency and acquire valid title to such money.

## V. *Burden of Proof.*

█ As stated before, these are consolidated proceedings brought under Section 9(a) of the Trading with the Enemy Act. It has been clearly established that in a suit of this nature brought under Section 9(a) wherein the plaintiff must establish his "right, title, or interest," Standard Oil Co. v. Clark, 2 Cir., 163 F.2d 917, certiorari denied 333 U.S. 873, 68 S.Ct. 901, 92 L.Ed. 1149; Cummings v. Hardee, 70 App.D.C. 18, 102 F.2d 622, Hardee v. Murphy, certiorari denied 307 U.S. 637, 59 S.Ct. 1033, 83 L.Ed. 1518, the plaintiff must carry this burden of proof. Feller v. McGrath, D.C., 106 F.Supp. 147, affirmed Feller v. Brownell, 3 Cir., 201 F.2d 670, certiorari denied 346 U.S. 831, 74 S.Ct. 24, 98 L.Ed. 355; Thorsch v. Miller, 55 App.D.C. 295, 5 F.2d 118, appeal dismissed 274 U.S. 763, 47 S.Ct. 577, 71 L.Ed. 1318; Sturchler v. Hicks, D.C.N.Y. 1926, 17 F.2d 321. Since a suit such as this is equitable, the plaintiff may recover a property right that would be recognized in equity, even though he may fail to show legal title. Standard Oil Co. v. Clark, 2 Cir., 163 F.2d 917, certiorari denied 333 U.S. 873, 68 S.Ct. 901, 92 L. Ed. 1149. However, if the plaintiff can show only a debtor-creditor relationship, he may not recover under Section 9(a), but rather he would be required to proceed under Section 34. Cabell v. Clark, 2 Cir., 162 F.2d 153; Alley v. Clark, D.C. E.D.N.Y., 71 F.Supp. 521; Trading with the Enemy Act, T. 50 U.S.C.A.Appendix, § 34(i).

█ By reason of the situation presented in the consolidated cases before this Court, either plaintiff may recover if it shows that it gave up its money because of duress. In re Meyer, D.C., 106 F. 828, 831. If this is shown, there is still another step which the plaintiff must then take before it may recover. It must then either identify the vested property as being the same property with which it parted or show that it obtained a lien on the commingled fund. But, if it merely shows that it suffered a compensable wrong by the Japanese or their agents, it could not recover under Section 9(a) which provides that a right, title or interest must be shown.

More specifically, in order for a plaintiff to recover, it must show as a fact by a preponderance of the evidence that the money which was recovered by the United States Army and subsequently made the subject matter of vesting order P–285 was the same money, or a part of the same money, which was transferred from Philippine National Bank, Bacolod, to the Bank of Taiwan in March, 1945.

Plaintiff Bank of the Philippine Islands contends that it has a lien on the vested property by reason of the wrongful taking in March of 1943. To prove this it must show that the vested property was a part of the fund which was acquired by the Japanese through Nampo from the Bank of the Philippine Islands in March, 1943; and even prior to proving this, the Bank of the Philippine Islands must show that the taking was unlawful.

Philippine National Bank must show that the vested money was that same money that was taken from its branch office in Bacolod by the Japanese in March, 1945, and must also show that this taking was unlawful.

## VI. *Claim of the Bank of the Philippine Islands.*

The only witness to testify for the Bank of the Philippine Islands was Alberto F. DeVilla-Abrille. Since the basis of this plaintiff's case rests upon the manner in which its Philippine currency was transferred to Nampo, this witness' testimony should be examined in detail on this point.

Mr. DeVilla-Abrille, who was the assistant cashier of the Bank of the Philippine Islands in 1943, stated that in January and February of 1943, the Bank of the Philippine Islands had Philippine Treasury Certificates and Japanese Military Notes in its vaults, the Philippine Treasury Certificates totaling about

₱600,000. At the end of February, 1943, the Bank of the Philippine Islands received a letter from Nampo stating that all Philippine Treasury Certificates up to ₱20.00 denomination were to be delivered by the Bank of the Philippine Islands to Nampo, the latter being an agency of the Japanese Puppet Government. After it was determined that the letter from Nampo was issued pursuant to a Japanese military order, the president of the Bank, Pedro J. Compos, decided that the bank had no alternative but to comply with the letter. It was at this point in his testimony that the witness stated that he had observed the Japanese brutally treating civilians.

Subsequently, arrangements were made between this witness, acting for the Bank of the Philippine Islands, and Saburo Higuchi of Nampo for delivery of the Philippine Treasury Certificates. Thereafter, on March 2, 3, 4, 5, and 9, 1943, Philippine Treasury Certificates were delivered to Nampo personally by this witness until all denominations up to ₱20.00 had been delivered. In exchange for these Certificates, the Bank of the Philippine Islands received Japanese Military Notes from Nampo, in a sum equivalent to the amount of the Certificates it had turned over to Nampo. DeVilla-Abrille also testified that the Bank of the Philippine Islands segregated these Japanese Military Notes from other cash it had and later exchanged them for Japanese Military Notes of larger denominations. He also testified that the Japanese peso was legal tender during the occupation and that although the Bank of the Philippine Islands did not use this currency, it could have used it if it so desired. He stated that this money was presently in the possession of the Bank of the Philippine Islands.

In summary, this plaintiff contends that the transfer was effected through duress and that the Japanese thereby did not acquire good title.

This transfer of Philippine currency by the Bank of the Philippine Islands to Nampo was pursuant to an order of the Japanese Military authorities who occupied the status of belligerent occupants. It is well established that an occupying power has certain rights which he may exercise in regard to the occupied country, especially when the purpose of the exercising of these rights involves the maintenance of public order. Hague Regulations, Art. 43. One of these rights is that a belligerent occupant may regulate currency and may make the money it issues legal tender. Aboitiz & Co. v. Price, D.C., 99 F.Supp. 602. It is apparent from the evidence presented that this is what the Japanese did, especially so since it is contended by both plaintiffs that the purpose of the Redemption Program was to pacify certain portions of the occupied islands.

It is thus established that the Japanese had lawful authority for their acts in this matter of regulating currency. Therefore, it follows that the Bank of the Philippine Islands in transferring its Philippine currency to Nampo was doing what it was legally bound to do— that is—it was obeying a lawful order of a belligerent occupant. Brownell v. Schering Corp., D.C., 129 F.Supp. 879, affirmed 3 Cir., 228 F.2d 624, certiorari denied 351 U.S. 954, 76 S.Ct. 849, 100 L. Ed. 1477.

It has also been established that at the time of this transfer, Japanese Military Notes were legal tender. So, when the Bank of the Philippine Islands transferred its Philippine currency for the Japanese money, it actually and in fact received valuable consideration.

The allegation of duress advanced by the Bank of the Philippine Islands was not in fact or in law duress; the Bank may have parted with its money reluctantly, but as is sometimes the situation, lawful orders are sometimes obeyed with a degree of reluctance. To hold otherwise, one could easily come to the conclusion that if a person did not feel that he should obey an order that is lawful and set forth by proper authorities, he would merely have to claim "duress" to be relieved from compliance. That is not so.

Further, in order to have a transaction such as the one involved here set aside on

the ground of duress, a condition precedent to this would be a showing that the compulsion was wrongful. Williston on Contracts, Rev.Ed.1937. Secs. 1606, 1608, 1624. However, this Court finds that the transfer in question was merely compliance with a lawful order based on a legal right that was exercisable by an occupying power.

This plaintiff has placed much reliance upon Inter-Allied Declarations, United States Declarations, and a directive of General Douglas MacArthur, as authorities to sustain its contention that this transfer of funds should be set aside. However, these Declarations and the directive refer only to *unlawful* acts. 22 Philippine Law Journal 1947, p. 32. Therefore, in order for any of these Declarations or the directive to lend support to the position of the Bank of the Philippine Islands, there must be an initial showing that the transfer was unlawful. As was previously decided, the act of the Japanese was lawful, and it is this Court's conclusion that the Declarations and the directive do not apply to the situation as presented to the Court.

The Bank of the Philippine Islands does not have a lien upon the vested property for two reasons. First, it has not been established that the vested property was part of the fund that was transferred by the Bank to Nampo in March, 1943, said fund being the one upon which the Bank claims a lien.

Secondly, before a lien of this type will be impressed upon a fund, there must be a showing that the transfer was wrongful, or unlawful. In re Meyer, D.C., 106 F. 828. As the Court has stated before, there is no such showing in this case.

In summary, this Court finds as to the claim of the Bank of the Philippine Islands that the transfer of funds by the Bank of the Philippine Islands to Nampo in March, 1943 was not the result of duress but was, in fact, a lawful transfer, and was not set aside by reason of proclamations of the United States and her Allies or by General MacArthur's directive. Further, this was a transfer for which the Bank of the Philippine Is-

lands received valuable consideration, and the said fund is not subject to the impression of a lien in favor of the Bank of the Philippine Islands.

VII. *Claim of the Philippine National Bank.*

This plaintiff's claim is, briefly, that in March of 1943, it withdrew some of its own money (in Philippine currency) from Nampo with whom the Philippine National Bank maintained an account; that some of this money was used in the Redemption Program which terminated in October, 1943; that the remainder of this money was unlawfully seized by the Japanese during March, 1945 in Bacolod, and that this bank was the owner of this money and, therefore, was the owner immediately prior to the vesting order.

At this point it should be determined whether the vested money was the same money that was taken from the Bacolod branch of the Philippine National Bank in March, 1945. In an attempt to establish this proposition, the Philippine National Bank relies upon the testimony of Mr. Buenaventura. His testimony on this point was that he went to the Capitol Building in Bacolod in April, 1945 and there he saw boxes of the same type that he had turned over to Taiwan Bank in the previous month. When these boxes were opened, they contained the same kinds of money that he had turned over to Taiwan, and the money was wrapped with the same kind of wrappers. He also stated that he had not recorded the serial numbers of the bills that he turned over to the Bank of Taiwan. The Philippine National Bank now asks this Court to conclude that the money found by the United States Army was the same money that Mr. Buenaventura turned over to the Bank of Taiwan some 5 weeks earlier.

Mr. Buenaventura, on direct examination, was rather strong in support of the claim of the Philippine National Bank. However, his testimony was not as positive as it could have been and his credibility was seriously impaired on cross-examination by testimony that he had given on prior occasions as to the source of the boxes that he used to pack the

money that was taken to the Bank of Taiwan, the markings on the boxes, and also as to the number of boxes used in packing the money.

It was also admitted by Mr. Buenaventura that the Bank of Taiwan had Philippine currency of its own prior to the time that the Philippine banks reopened. Also, there may have been other banks operating throughout the islands, and these banks could have had transactions with Nampo and Taiwan similar to the transactions involved here. There is nothing in the record to show that this was not the case.

There is much conjecture and speculation in the briefs and arguments of the plaintiffs that *suggest* that the vested money was the same money taken from Bacolod in March, 1945, but the record of the case does not prove this point to the satisfaction of this Court.

It seems in a case of this type that the plaintiffs would have taken depositions of certain individuals such as the American military personnel and the Japanese bank officials with a view toward strengthening their claims. Unfortunately, this was not done.

Further, in order for a plaintiff to recover, beneficial ownership of the fund involved must be established. Feller v. McGrath, supra. That is, he must prove that he is the real or beneficial owner of the property. To begin with, the Philippine National Bank has not even shown the source of the money involved or whether it was really the money of that Bank. It did show that the money was in the possession of the bank, but it was not revealed in what capacity Philippine National Bank held the money, whether it was the true owner, or whether it was merely holding the money for another as in a fiduciary or agency relationship. If the Philippine National Bank held the money in this latter capacity, it would not be the beneficial owner as is required under Section 9(a).

From the evidence, it appears that the Philippine National Bank knew the money to be used in the Redemption Program would come from Nampo, but there is no testimony to establish how this was known. It is no explanation for the Bank to state that it withdrew the money to carry out the Redemption Program. The Philippine National Bank alleged that the money was its own but there is no explanation beyond that, and there is no proof that it was the money of that Bank. If it were the money of that Bank, the Japanese could order Philippine National Bank to put this money into the Redemption Program. But, if the money were owned by the Japanese, the Bank would have no claim to the unused balance. The executive orders and the proclamation issued by the Japanese provided for the reopening of branches of the Philippine National Bank and that these branches were to act as agents in the Redemption Program, but there is nothing further. The books and records of the Philippine National Bank do not shed any light as to the source of the money, or in what capacity it was held.

It seems consistent with the evidence to conclude that the Japanese Military Government could have been the real owner of the money used in the Redemption Program and that the money was to be used for the benefit of the Government who was to repay the Philippine National Bank for the amounts of emergency notes accepted for deposit by its branches. This would thus establish equitable ownership in the Japanese Military Government. This was not disproven by the Philippine National Bank and, therefore, this conclusion is just as consistent with the evidence as the conclusion that this plaintiff urges upon the Court. Thus, the Philippine National Bank has not carried the burden of proof necessary to establish the required pre-vesting ownership.

As a matter of law, the Philippine National Bank was not the prevesting of the property vested. The defendants contend that this bank was not a private banking institution but rather a public institution and, as such, the property of the bank being the property of the Government would be subject to confiscation. ▮ The main point relied upon by the defendants in this contention is the

fact that the Philippine Government owned 99% of the stock of the Philippine National Bank. However, the record shows that there are approximately 80 other individual stockholders and that this bank is a distinct legal entity that is engaged in private business. It has been consistently held that banks of this type, such as federal or national banks, which contain private interests are private corporations in which the Government has an interest, as distinguished from being a department of the Government. United States Shipping Board Emergency Fleet Corp. v. Western Union Tel. Co., 1928, 275 U.S. 415, 48 S.Ct. 198, 72 L.Ed. 345; National Labor Relations Board v. Bank of America, 130 F.2d 624. This Court finds that the Philippine National Bank was a private commercial bank

Having established the foregoing, the question still remains whether the taking on March 2, 1945, was lawful, for if answered affirmatively, this would transfer ownership of the money to the Japanese.

· ■ It is a recognized right of a belligerent occupant to levy contributions and make requisitions for the needs of the army. Hague Regulations, Arts. 49, 51, 52; Thorington v. Smith, 8 Wall. 1, 19 L.Ed. 361. Contributions are generally held to be money payments, while requisitions refer to the taking of articles for consumption or use, as distinguished from money. The distinction is unimportant in this case for the taking was of a particular kind of money peculiarly adapted for the purpose the Japanese had in mind, namely, "that they might use that money to purchase from the Filipinos some foodstuff and supplies." Transcript, pgs. 329, 330.

When this money was taken from the Bacolod branch of the Philippine National Bank, Mr. Yoshida of the Bank of Taiwan gave a receipt for said money. He was thus acting in compliance with Hague Regulations, Articles 51 and 52, which require such receipt. Also, the testimony of Mr. Buenaventura indicates that he regarded the transaction as one for which the Philippine National Bank would be compensated, for he stated that by agreement with Mr. Yoshida he entered the transaction as "Due from Taiwan Bank—Special Account." The Court finds that the transaction was a lawful one and, therefore, ownership passed to the Japanese.

■■ This plaintiff also relies on the doctrine of "post liminium". This is a fiction of civil law by which persons or things taken by the enemy are restored to their former status on coming again under the power of the nation to which they formerly belonged. This doctrine, or fiction, is recognized by the law of nations. However, before this doctrine can be relied upon there must be a preliminary showing that the taking was unlawful for property that has been lawfully taken by an enemy is not subject to this doctrine. Acts that are done, once and for all, that are within an invader's competence to perform are valid. United States v. Rice, 4 Wheat. 246, 4 L.Ed. 562; Oppenheim's International Law (7th Ed., Vol. II, Sec. 169). As pointed out previously, the act of the Japanese was lawful and, therefore, the doctrine of "post liminium" does not apply to the present situation.

*Conclusion*

■ It has not been proven by a preponderance of the evidence that the money captured by the United States Army was the same money that the Philippine National Bank, Bacolod branch, turned over to the Bank of Taiwan in March, 1945. Thus, neither plaintiff has carried the burden of proof that is necessary in this proceeding to establish a legal or equitable title in the vested property.

Finally, as a matter of law, neither plaintiff made out a case. The Bank of the Philippine Islands turned over its money in a lawful transaction, so it has no claim to the vested property. The Philippine National Bank, a private corporation, turned over its money to the Japanese pursuant to a valid requisition which passed title to the Japanese. Thus, the property when captured and later vested was enemy property.

Counsel will submit appropriate order.